## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JOSHUA DANIEL STEVENS,**

     **Plaintiff,**

**v.**                                                     **Civil Action No. 1:18cv140**
                                                          **(Judge Kleeh)**

**BETSY JIVIDEN; KAREN**
**PSZCOLKOWSKI; WILLIAM**
**YURCINA; MIKE HILL; RICHARD**
**MCKEEN; RUSSELL COOK;**
**CHRISTOPHER FOLMER;**
**JAMIE GRAY; PAMELA MOORE;**
**and MICHELLE SCOTT,**

     **Defendants.**

## PRELIMINARY[1] REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* Plaintiff, an inmate then-incarcerated at the Northern Correctional Facility[2] ("NCF") in Moundsville, West Virginia, filed this civil rights action pursuant to 42 U.S.C. § 1983 on July 5, 2018. ECF No. 1. Plaintiff has been granted permission to proceed *in forma pauperis* and paid an initial partial filing fee. ECF Nos. 7, 9. On November 30, 2018, a Miscellaneous Case Order was entered, reassigning this case from Senior District Judge Irene M. Keeley to District Judge Thomas S. Kleeh. ECF No. 11. On January 28, 2019, Plaintiff filed copies of sworn affidavits by two other inmates. ECF No. 12.

---

[1] Because of Plaintiff's ongoing health issues, unrelated to the claims in the complaint, the Plaintiff has been granted multiple extension of time in which to respond to the second two dispositive motions filed in this case. Accordingly, for reasons appearing to the Court, this Preliminary Report and Recommendation will address only the first fully-briefed dispositive motion (that filed by Defendants Gray and Moore). A subsequent Report and Recommendation will be issued later, to respond to the remainder of Plaintiff's claims.

[2] Plaintiff is presently incarcerated at Mt. Olive Correctional Center ("MOCC") in Mt. Olive, West Virginia.

On August 21, 2019, an initial review pursuant to Local Rule of Prisoner Litigation Procedure ("LR PL P") 2 was conducted and the Defendants were ordered to answer the complaint. ECF No. 14.  Summonses were issued for the named defendants. Id. On September 18, 2019, the United States Marshal Service ("USMS") notified the *pro se* law clerk ("PSLC") assigned to this case that the USMS were unable to serve Defendant Yurcina at the address provided in Plaintiff's complaint; by Order entered September 18, 2019, that summons was reissued.  ECF No. 18. On September 20, 2019, the original summonses for Defendant Scott and Yurcina were returned unexecuted; all other summonses were returned as executed. ECF Nos. 21 – 29.

On September 26, 2019, Defendants Gray and Moore filed a Motion to Dismiss with a Memorandum in Support [ECF Nos. 30, 31]; because Plaintiff was proceeding *pro se*, on September 30, 2019, a Roseboro Notice was issued, advising him of his right to respond to the dispositive motion.  ECF No. 33. On October 1, 2019, the reissued summons for Defendant Yurcina was returned executed. ECF No. 35. On October 28, 2019, Plaintiff moved for an extension of time in which to respond to the Roseboro Notice, attaching a response in opposition. ECF No. 37. On November 5, 2019, Defendants Gray and Moore filed a reply to Plaintiff's response in opposition. ECF No. 38. By Order entered the same day, Plaintiff's motion for an extension of time was granted. ECF No. 39. On April 7, 2020, Plaintiff filed a duplicate copy of his original response in opposition. ECF No. 41. On April 9, 2020, Defendants Gray and Moore moved to strike the duplicative pleading. ECF No. 43. By Order entered April 14, 2020, counsel for the Wexford defendants was directed to provide an address at which Defendant Scott could be served. ECF No. 44. The same day, the Clerk was directed to reissue summonses for the WVDOC defendants and the USMS were directed to effectuate proper service. ECF No. 45. The summonses were reissued the same day. ECF No. 46.

On April 16, 2020, Plaintiff filed a response to Defendants Gray and Moore's motion to strike. ECF No. 47.  On April 21, 2020, the WVDOC defendants filed a Motion to Dismiss with a memorandum in support. ECF Nos. 48, 49. The summons for Defendant Scott was reissued the same day. ECF No. 50. A second Roseboro Notice was issued on April 22, 2020. ECF No. 51. On May 12, 2020, Defendant Scott filed a Motion to Dismiss with a memorandum in support. ECF No. 55, 56.  A third Roseboro Notice was issued May 13, 2020.  ECF No. 57.  On May 14, 2020, Plaintiff moved for appointed counsel, or alternatively, to stay the case. ECF No. 59. The reissued executed summonses for the remaining six of the seven WVDOC defendants and defendant Scott were docketed the same day. ECF Nos. 60 – 65. By Order entered May 20, 2020, Plaintiff's letter motion to appoint counsel was denied without prejudice and his alternative motion to stay the case was construed as a motion to extend the time in which to respond to the remaining two dispositive motions and granted. ECF No. 67.

On June 2, 2020, Plaintiff moved for reconsideration of the Order denying appointed counsel.  ECF No. 69. By Order entered June 4, 2020, the motion to reconsider was denied. ECF No. 70. On June 5, 2020, the summons for Defendant Jividen was returned executed.  ECF No. 71. On June 16, 2020, Plaintiff moved again for appointed counsel or alternatively, for a further extension of time. ECF No. 73. By Order entered June 18, 2020, Plaintiff's third letter motion to appoint counsel was denied in part without prejudice, and his alternative motion for a third extension of time was granted in part. ECF No. 74.

Accordingly, the case is before the undersigned for an initial review and preliminary report and recommendation pursuant to LR PL P 2.

## II. <u>Contentions of the Parties</u>

### A. <u>Plaintiff's Complaint</u>

In his complaint, Plaintiff raises claims against two groups of defendants: three Wexford (Medical) Health Sources, Inc. (hereinafter "Wexford") health services employees: Defendants Medical Administrator Jamie Gray ("Gray"), Nurse Practitioner Pamela Moore ("Moore"), and LPN Michelle Scott ("Scott"), and seven West Virginia Division of Corrections ("WVDOC") employees: Defendant C.O. Christopher Folmer ("Folmer"), WVDOC Commissioner Betsy Jividen ("Jividen"), Warden Karen Pszcolkowski ("Pszcolkowski"), Deputy Warden William Yurcina ("Yurcina"), Associate Warden of Security ("AWS") Mike Hill ("Hill"), Shift Supervisor Richard McKeen ("McKeen"); and C-2 Pod Supervisor Russell Cook ("Cook").

Plaintiff raises an Eighth Amendment claim of deliberate indifference against Defendant Folmer for failing to adhere to WVDOC's policy on escorting inmates in mechanical restraints. Plaintiff avers that on or about April 16, 2018 at the NCF, Folmer was escorting Plaintiff down a stairwell to the shower while Plaintiff was wearing mechanical restraints with his hands secured behind his back. ECF No. 1-1 at 2. Plaintiff fell, sustaining unspecified head, neck, spine, finger, lower back and leg injuries.  <u>Id.</u>; <u>see</u> <u>also</u> ECF No. 1 at 9 - 10.

Plaintiff also raises a supervisory liability claim against the WVDOC defendants Jividen, Pszcolkowski, Yurcina, Hill, McKeen, and Cook, for their failure to supervise, train, and discipline C.O. Folmer on how to properly escort inmates. ECF No. 1 at 10.

Further, Plaintiff contends that when he exercised his First Amendment rights to free speech and to petition the court by filing grievances alleging that his injuries occurred because the defendants were not doing their jobs, Defendants Cook and Folmer told the other segregation unit inmates that the reason their showers were late was because Plaintiff was a whistleblower, which

caused him to be labeled as a rat, targeted by other inmates who threatened him, endangering his life. Id. at 10 – 11.

Plaintiff also raises Eighth Amendment claims of deliberate indifference to serious medical needs against Defendants Medical Administrator Jamie Gray ("Gray"), Nurse Practitioner Pamela Moore ("Moore"), and LPN Michelle Scott ("Scott") arising out of the denial of timely and adequate medical care for his fall-related injuries.  Id. at 11.

Plaintiff also raises a Fourteenth Amendment claim against Defendant Pszcolkowski, alleging that his due process rights were violated when she denied his request for protective placement in a Special Management Unit ("SMU"). Id. at 12. Plaintiff contends that as a witness against three violent inmates, he sought protection, but Pszcolkowski refused to provide it. Id. Plaintiff claims that the denial of SMU placement violated a protected liberty interest under both the West Virginia Constitution, the Eighth Amendment, and WVDOC Policy Directive 32603. Id.

Plaintiff contends that he exhausted his administrative remedies. ECF No. 1 at 5.

Plaintiff states that as a result of the Defendants' improper behavior, in addition to the physical injuries to his head, neck, spine, finger, lower back and leg injuries, he experienced pain, suffering, emotional and psychological distress. Id. at 9 - 10.

As relief, Plaintiff seeks "nominal" damages of $10,000.00 against each defendant, jointly and severally; and compensatory damages of $25,000.00, jointly and severally against each defendant, and punitive damages of $150,000.00 against each defendant, jointly and severally. Id. at 9. He also requests to be released from segregation. ECF No. 1-1 at 2.

Attached to Plaintiff's complaint are copies of grievances and responses on multiple issues, [ECF Nos. 1-1 – 1-13]; and copies of two sworn affidavits from Plaintiff regarding claims not at issue in this preliminary R&R. See ECF Nos. 1-15, 1-14.

Subsequent to the filing of his complaint, Plaintiff filed copies of sworn affidavits from two other inmates, Devin Thaxton ("Thaxton") and David Dean Buzzard ("Buzzard"). See ECF Nos. 12 and 12-1. Thaxton's affidavit stated in pertinent part that:

> . . . [o]n or about April 16, 2018 I was housed in the NCF segregation unit (C2-CELL-7). During P.M. segregation showers Correctional Officer Folmer did stop escorting inmate Joshua Stevens on the top tier and began having a conversation with me at my cell door.  While inmate . . . Stevens was wearing mechanical restraints, with his hands secured behind his back, he did fall down the stairs. The only reason . . . Stevens fell down the stairs is because C.O. Folmer deliberately failed to escort him while he was wearing the mechanical restraints. When . . . Stevens fell I did see him strike his head on the floor of the top tier . . . Stevens did request to go to medical and nurse Michelle Scott did tell him, at the stairs, that she had to complete pill call before she could asses him . . . Stevens was complaining of head pain, pain in one of his fingers, back pain and I heard him say that he was dizzy and his ears were ringing. He was then placed back in his cell and the nurse left the unit.

ECF No. 12 at 1 – 2. Buzzard's affidavit stated in pertinent part that

> . . . [o]n or about April 16, 2018, I was housed in the segregation unit at NCF (C2-CELL-32). From my cell I did have an unobstructed view of the stairs which lead to the top tier of the segregation cells which is located in close proximity to segregations cells 1 through 16. At approximately 6:00 P.M., during segregation shower time, I did witness inmate Joshua Stevens, who was wearing a pair of mechanical restraints, with his hands secured behind his back, fall down the stairs from the top tier. During this time Correctional Officer Folmer was not escorting . . . Stevens, which resulted in . . . Stevens tripping over his shower sandals and falling down the stairs.  Because officer Folmer was not escorting . . . Stevens . . . Stevens was forced to attempt to stop himself from falling down the stairs. . . Stevens did attempt to stop himself . . . by grabbing the railing . . . which was attached to the wall. Due to . . . Stevens' hands being secured behind his back . . . his left index finger was injured when he was forced to essentially save himself from falling down the entire flight of stairs. All of this resulted from C.O. Folmer's deliberate failure to escort . . . Stevens. I . . . saw . . . Stevens fall down the stairs. While falling, he managed to turn his body to the position facing the top of the stairs and lean forward toward the landing in order to save himself from falling down the entire flight of stairs . . . As a result of . . . Stevens wearing . . . restraints[] with his hands secured behind his back, he had no way to break his fall and as a result, he struck his head on the floor of the landing at the top of the stairs. . . . Stevens requested medical attention, medical came to his location at the bottom of the C2 stairs and nurse Michelle Scott[] spoke to him for approximately 5 to 10 seconds and left. . . Stevens was then placed in his cell and about 30 minutes later medical

returned and he could not walk on his own so he was placed in a wheelchair and taken to medical. After . . . Stevens left the pod, I went to sleep.

ECF No. 12-1 at 1 –3.

## B. __Motion to Dismiss by Defendants Gray and Moore__

Defendants Gray and Moore summarize Plaintiff's claims against them as 1) failure to timely or adequately treat him after the fall; 2) failure to adequately evaluate him during an overnight stay in the medical unit the night of the fall, including prematurely returning him to his cell the next day while he was still symptomatic; and 3) failure to provide follow-up treatment for his injuries after the fall. ECF No. 31 at 2 – 3.

Gray and Moore contend that the case should be dismissed as to them because Plaintiff has not set forth sufficient facts to prove the subjective component of a deliberate indifference claim against them, and the grievance forms attached to Plaintiff's complaint actually disprove his claims. Id. at 6 - 7. Further, they argue that as employees of Wexford, a private corporation that contracts with a state entity to provide medical services to inmates, because Plaintiff cannot show that he had a clearly established right to a particular course of treatment for a fall injury, they are entitled to raise a qualified immunity defense. Id. at 8 - 9.

## C. __Plaintiff's Response in Opposition__

Plaintiff contends that the Defendants are not entitled to qualified immunity because they knew he had serious medical needs and failed to provide immediate treatment for the same, despite knowing that their unlawful conduct violated his constitutional rights. ECF No. 37-1 at 2. He reiterates the facts of his claims with much more detail than originally provided in his complaint, and attempts to refute Defendant Gray and Moore's arguments on the same. He contends that Defendant Scott, a nurse, witnessed his fall and asked if he "was alright." Id. at 1. He told her he was not, because his head was spinning, his ears were ringing, and he felt like he might vomit. Id.

7

He contends that Scott sent him back to his cell anyway, saying she would "come back for me in a minute" but that while left alone in his cell for "nearly 45 minutes," he passed out, fell again, and vomited twice, waiting for help. Id. After Scott returned with some NCF staff members and a wheelchair, he was taken to medical, evaluated by Scott and another nurse whose name he does not know (hereinafter the "unknown" nurse), told that he "was fine," but put in a medical cell overnight "just in case." Id. Plaintiff contends that this unknown nurse was engaged to Defendant Folmer, the officer who let him fall. Id.

Plaintiff avers that he was not given adequate care for a head injury with symptoms of concussion, and was subjected to "unnecessary and wanton infliction of pain" trying to get the Wexford employees to realize that his head, back, neck, and left hand and finger were "definitely" injured. Id.  He argues that the reason the healthcare staff were deliberately indifferent to him was because they were protecting Folmer. Id. He states that the unknown nurse (Folmer's fiancé) was in charge of evaluating him through the night as he laid there "in and out of consciousness and with a major headache and lower back pain." Id. at 1 – 2. The following morning, he was told that he was "fine" and Defendant Moore told him that what he was experiencing was "normal for a falling accident." Id. at 2.

Plaintiff avers that in the days and weeks following the fall, he sent "constant" sick calls and grievances to medical, asking to be seen for his injuries and was told that he was "fine." Id. When he requested a CAT scan of his head, he was told "that it was out of the question."  Id. He contends that he still has migraine headaches, which he never had before; back pain; his left hand and index finger no longer have "strength to hold anything anymore" and hurt all over when being used; and his neck pops and hurts when he turns his head. Id.

Plaintiff argues that his injuries were sufficiently serious and that Gray and Moore had the sufficiently culpable state of mind to show deliberate indifference, because they continuously tried to downplay his medical issues; refused to treat them; and refused to send him to an outside provider for evaluation, because it might expose their cover up. Id.

Plaintiff avers that prior to his fall he was a "healthy, in shape individual" but that now he is overweight and depressed because of physical limitations from his injuries. Id. He "can hardly walk" some days, his legs  go numb at times, and he has near-daily migraine headaches, all of which has affected him physically and mentally. Id. He contends that since leaving the care of Gray and Moore, he has received some treatment for his back, hand, and the migraines. Id.

**D. Defendants Gray and Moore's Reply**

Gray and Moore argue that Plaintiff's response merely repeats his factual allegations and makes conclusory allegations that his claims rise to the level of deliberate indifference. ECF No. 38 at 1. They reiterate their position that the documents Plaintiff attached to his complaint actually refute, rather than support his claims.  Id. at 1 – 2. They contend that Plaintiff's claims arise to nothing more than a disagreement with the medical providers' diagnosis and course of treatment and do not rise to the level of an Eighth Amendment violation. Id. at 2. Moreover, they note that Plaintiff's attempted non-specific rebuttal, vaguely alluding to the fact that the grievance documents attached to his complaint were "not what they seem," likewise is insufficient to state a deliberate indifference claim. Id. at 2 - 3.

**E. Plaintiff's Second Response in Opposition**

Plaintiff filed a duplicate copy of his first response in opposition to Defendant Gray and Moore's dispositive motion. ECF No. 36.

**F. <u>Defendant Gray and Moore's Motion to Strike Duplicative Pleading</u>**

Defendants Gray and Moore move to strike the second copy of Plaintiff's response in opposition, identical to his first, which was filed after their reply. ECF No. 43.

**F. <u>Plaintiff's Response to Defendant Gray and Moore's Motion to Strike Duplicative Pleading</u>**

Plaintiff avers that since he filed his response in opposition to Defendants Gray and Moore's dispositive motion, he has sustained a concussion[3] and undergone two emergency brain surgeries, affecting his memory and thought; because he had not received anything from the Court, he was unsure whether he had filed his response, so he sent it again. ECF No. 47.

### III. <u>Standard of Review</u>

**A. <u>Section 1983 Claims</u>**

Plaintiff is seeking relief pursuant to 42 U.S.C. § 1983. ECF No. 51 at 1. Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

**B. <u>Sufficiency of a Complaint</u>**

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. <u>See</u> Fed.R.Civ.P.8 (providing general rules of pleading), Fed.R.Civ.P.9 (providing rules for pleading special matters), Fed.R.Civ.P.10 (specifying pleading form), Fed.R.Civ.P.11 (requiring the signing of a pleading and stating its

---

[3] Plaintiff's May 14, 2020 letter motion for appointed counsel, or alternatively, for a stay in the case states that he was "jumped at Salem [Salem Correctional Center] and had my brains kicked in basically." ECF No. 59.

significance) and Fed.R.Civ.P.12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). See Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009).

Although Fed.R.Civ.P.8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990).

## C. Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. Revene v. Charles County Comm'rs., 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. In addition to pleading sufficiently specific factual allegations, a plaintiff must assert a plausible claim in the complaint that is based on cognizant legal authority. Ashcroft v. Iqbal, 556 U.S. 662 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." Id.

Because Plaintiff is proceeding *pro se*, the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Haines v.

11

Kerner, 404 U.S. 519 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978);

Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent

standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent

standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal

construction means only that if the Court can reasonably read the pleadings to state a valid claim

on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir.

1999). However, a court may not construct the plaintiff's legal arguments for him or her. Small v.

Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely

presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## IV. Analysis

### A. Deliberate Indifference to Serious Medical Needs

To state a claim under the Eighth Amendment for ineffective medical assistance, the

plaintiff must show that the defendant acted with deliberate indifference to his serious medical

needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment

cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of

a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted

with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991).

Therefore, "the Eighth Amendment does not apply to every deprivation, or even every

unnecessary deprivation suffered by a prisoner, but *only* that narrow class of deprivations

involving 'serious' injury inflicted by prison officials acting with a culpable state of mind."

Hudson v. McMillan, 503 U.S. 1, 20 (1970) (emphasis original).

A serious medical condition is one that has been diagnosed by a physician as mandating

treatment or that is so obvious that even a lay person would recognize the need for a doctor's

attention. <u>Gaudreault v. Municipality of Salem, Mass.</u>, 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. <u>Monmouth County Corr. Inst. Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3rd Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).[4]

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference. <u>Wilson</u>, 501 U.S. at 303. A finding of deliberate indifference requires more than a showing of negligence. <u>Farmer v. Brennan</u>, 511 U.S.

---

[4] The following are examples of what does or does not constitute a serious injury. Testicular cancer is a serious medical need. <u>Neihaus v. GEO Group, Inc.</u>, No. 3:13-cv-992, 2015 U.S. Dist. LEXIS 39481, *11, 14, Anderson, L.R. (S.D. Miss. Mar. 27, 2015). A torn rotator cuff is a serious injury. <u>Fishback v. Depuy Orthopaedics</u>, 2013 U.S. Dist. LEXIS 35562, * 28, 2013 WL 1010386 (D. Md. 2013); see also <u>Oliver v. Pa Dep't of Corr.</u>, 2014 U.S. Dist. LEXIS 2368, *17-18, 2014 WL 80725 (E.D. Pa. 2014); <u>Kostyo v. Harvey</u>, No. 09-2509, 2010 U.S. Dist. LEXIS 93384, 2010 WL 3522449, at *8 (N.D. Ohio Sept. 8, 2010) ("Severe shoulder pain, including a possible rotator cuff tear, may qualify as a serious medical need."). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. <u>Veloz v. New York</u>, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. <u>Brice v. Virginia Beach Correctional  Center</u>, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. <u>Browning v. Snead</u>, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. <u>Finley v. Trent</u>, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. <u>Johnson v. Quinones</u>, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition.  <u>Clinkscales v. Pamlico Correctional Facility Med. Dep't.</u>, 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. <u>Harrison v. Barkley</u>, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the <u>Estelle</u> standard. <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip a serious condition. <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. <u>Loe v. Armistead</u>, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. <u>Giambalvo v. Sommer</u>, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, *e.g.,* <u>Lepper v. Nguyen</u>, 368 F. App'x. 35, 39 (11th Cir. 2010); <u>Andrews v. Hanks</u>, 50 Fed. Appx. 766, 769 (7th Cir. 2002); <u>Bryan v. Endell</u>, 141 F.3d 1290, 1291 (8th Cir. 1998); <u>Beaman v. Unger</u>, 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); <u>Thompson v. Shutt</u>, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); <u>Mantigal v. Cate</u>, 2010 WL 3365733 at *6 (C.D. Cal. May 24, 2010) report and recommendation adopted, 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); <u>Johnson v. Adams</u>, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); <u>Bragg v. Tyler</u>, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); <u>Vining v. Department of Correction</u>, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. <u>Cokely v. Townley</u>, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Multiple courts have held that inmates are not entitled to unqualified access to healthcare, and a mere disagreement in regard to the diagnosis and recommended course of treatment is insufficient to support a deliberate indifference claim. Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977); Wright v. Collins, 766 F.2d 841, 841-849 (4th Cir. 1985); Daye v. Proctor, 2015WL 1021560 25833, *3 (N.D. W.Va. Mar. 4, 2015) (Keeley, J.) citing Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) ("An inmate's disagreement with a medical officer's diagnosis or course of treatment will not support a valid Eighth Amendment claim."). Further, "inmates are not entitled to the best medical care or the particular medical care of the inmate's choosing." Witherspoon v. United States, 2010 U.S. Dist. LEXIS 107159, *10 (S.D. W.Va. Sept. 27, 2010) (internal citation omitted). Finally, a mere delay in medical treatment does not give rise to a constitutional violation, but rather, there must be some substantial harm to the inmate. Williams v. Miles, 2009 U.S. Dist. LEXIS 57833, at *2 (S.D. W.Va. July 7, 2009).

A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See

<u>Morales Feliciano v. Calderon Serra</u>, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing <u>Brock v.</u>
<u>Wright</u>, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, Plaintiff contends that he suffered unspecified injuries to his head, neck, back, left
hand and left index finger, and that Defendants Gray and Moore were deliberately indifferent by
failing to provide immediate post-injury care and timely and adequate follow up care. Because
neither party has produced medical records, the undersigned must glean the factual history from a
careful review of the contemporaneously-filed grievances and responses attached to Plaintiff's
complaint.[5]

On April 18, 2018, Plaintiff filed a grievance stating:

I fell on the steps in front of a Medical Staff member and 3 NCF staff members on
4/16/18 around 6 pm at pill call on C-2.  They asked I was alright and I told them
that I wanted to go to medical because my vision was blurry and my ears were
ringing my head and back hurt tremendously.  I was put back in the cell and told
that they would call and check after the nurse was done pill call.  I waited for over
30 minutes w/ these symtoms [sic] for them to bring a wheelchair and take me to
medical.

ECF No. 1-8 at 1. Under "relief," Plaintiff wrote "I want the nurse held responsible for not being
a professional and taking me to medical to be evaluated immediately. I want injuries like mine to
be taken seriously and handled professionally." <u>Id.</u> Plaintiff's Unit Manager accepted the grievance
on April 19, 2018. <u>Id.</u> On April 27, 2018, Plaintiff appealed to the Warden. <u>Id.</u> On May 2, 2018,
the Warden responded: "[p]lease refer to Level One Response. It is affirmed." <u>Id.</u> The Central
Office affirmed, denying the grievance. <u>Id.</u> Attached to the grievance is an April 18, 2018 note
from Tammy Simms, RN MSN, WV Regional Director of Nursing, stating in pertinent part that:

[t]his is in response to your grievance dated 4/18/18.  After reviewing your
grievance, I found that you were placed in the medical unit for observation
overnight. The Nurse Practitioner was notified that you were placed in medical and
orders received were to watch you overnight. You were checked on several times

---

[5] While there were other grievances/responses attached to the complaint, here, only the ones relevant to the claims
against Gray and Moore are included in this analysis.

throughout the night with only complaints of swelling and bruising to the left index finger. At 0548 you stated that your symptoms had subsided and you wanted to return to your cell. Because you showed no further symptoms you were released back to your cell the next afternoon. This was proper procedure concerning your issues.

Id. at 2.

On April 18, 2018, Plaintiff filed another grievance, stating in pertinent part that:

I was put in Medical overnight on 4-16-18 for injuries that I sustained to my head and back when falling on the steps. I was supposed to be evaluated by Pam the nurse practitioner before being released back to my cell.  This was never done. I was released back to my cell w/o a[n] evaluation. I still am having symtoms [sic] of this head injury and back injury . . .

ECF No. 1-7 at 1.  Under "relief," Plaintiff wrote "[f]irst and foremost, Pam needs to be held responsible for not doing her job as a professional. Injuries such as mine need to be taken more seriously. Just because I'm an inmate doesn't mean that I don't deserve proper and professional medical treatment." Id. Plaintiff's Unit Manager accepted the grievance on April 19, 2018. Id. On April 27, 2018, Plaintiff appealed to the Warden. Id. On May 2, 2018, the Warden responded: "[p]lease refer to Level One Response. It is affirmed." Id. Attached to the grievance is an April 18, 2018 note from Tammy Simms, RN MSN, WV Regional Director of Nursing to Plaintiff, stating in pertinent part:

[t]his is in response to your grievance dated 4/18/18.  After reviewing your grievance, I found that you were placed in the medical unit for observation overnight. The Nurse Practitioner was notified that you were placed in medical and orders received were to watch you overnight. You were checked on several times throughout the night with only complaints of swelling and bruising to the left index finger. At 0548 you stated that your symptoms had subsided and you wanted to return to your cell. Because you showed no further symptoms you were released back to your cell the next afternoon. This was proper procedure concerning your issues.

Id. at 2.

On April 21, 2018, Plaintiff filed another grievance, stating "I put in a sick call on my injuries and symtoms [sic] thereof [sic] on 4/18/18 and have not been checked or seen about them at all. By protocol they are supposed to see you within 24 hrs." ECF No. 1-6 at 1.  Under relief, Plaintiff noted "I want medical personel [sic] to do their jobs and take issues w/ peoples [sic] health and wellbeing serious." Id. The grievance was accepted by his Unit Manager on April 23, 2018. Id. Plaintiff appealed the grievance to the Warden on April 27, 2018. On May 2, 2018, the Warden responded, "[p]lease refer to Level One response. It is affirmed." Id. Attached to the response is an April 21, 2018 note  to Plaintiff from Tammy Simms, WV-Regional Director of Nursing, stating " . . . This is in response to your grievance dated 4/21/2018.  After reviewing your chart, I found that you were followed up with by the physician on 4/23/18. Therefore, you have been followed up with after your incident." Id. at 2.

On April 21, 2018, Plaintiff filed another grievance, stating "I need photos of my injuries taken by C/O Folmer on 4/17/18 and video of the incident where I fell on 4/16/18 on the steps in C-2 pod all the way up until they took me to medical, preserved as evidence  for future litigation." ECF No. 1-2 at 1. Under "relief sought," Plaintiff wrote "Released from segregation immediately and compensated for my injuries." Id. On April 23, 2018, his Unit Manager responded: "Your attorney needs to request these from our legal department in Central Office." Id. On April 27, 2018, Plaintiff appealed to the Warden. Id. The Warden's May 2, 2018 response was "Level One decision is affirmed. Any type of legal request must go through legal channels." Id.

On April 22, 2018, Plaintiff filed a grievance stating "I need the video from medical on 4/16/18 till 4/17/18, when I was in medical cell 3 and left at around 1:15 pm, preserved for future litigation. Thank you." ECF No. 1-4 at 1. Under "relief sought," Plaintiff noted "I want medical personel [sic] to be held responsible and injuries like mine to be taken seriously." Id. On April 23,

2018, his Unit Manager responded: "Please state what the issue was with medical and list the approximate time." Id. On April 27, 2018, Plaintiff appealed to the Warden. Id. The Warden's May 2, 2018 response was "as requested by the AWS, please state what happened & times[.] This allegation will be reviewed." Id.

On April 27, 2018, Plaintiff filed a grievance stating

Wexford Medical's Nurse Michelle Scott was deliberately indifferent to me and my head, back, neck, finger injuries by throwing me back into my cell on C-2 after witnessing me fall on the steps. She said she had to finish pill call before she could check me out after I told her that my ears were ringing and my head hurt bad and that my sight was blurry and I was nauseated. It took her over 30 minutes to have them come get me in a wheelchair. I lost concussness [sic] twice in the cell and puked.

ECF No. 1-9 at 1.   Under "relief," Plaintiff wrote "I want the nurse repremaded [sic] for not stoping [sic] everything she was doing for my emergency situation and I want injuries like mine to be taken seriously." Id. Plaintiff's Unit Manager accepted the grievance on April l30, 2018. Id. Plaintiff appealed to the Warden on May 10, 2018. Id. on May 14, 2018, the Warden responded: "[a]s requested, please indicate the specific incident, date/time so that it may be reviewed. Thank you." Id.   The Central Office affirmed, denying the grievance. Id. Attached to the grievance is a note from James F. Gray, H.S.A., stating in pertinent part that:

"[t]his is in response to your grievance dated 4/27/18.   After reviewing your grievance, I found that there is no documentation about what you are describing. I will need specific date and time of this. In general though, I want the staff to act professional at all times and will remind them of the procedures for emergencies and injuries.

Id. at 2.

On April 27, 2018, Plaintiff filed another grievance stating

I have submitted numerous sick calls concerning my head injury and back injury to no avail. Yes they had a physician see me and order x-ray for back and that is it. My symtoms [sic] are still effecting [sic] me tremendously every day and my sick

18

calls are not being answered w/in 24 hrs. This is not a joke. Just because I'm an inmate doesn't mean that I have to suffer or be in pain all day and night."

ECF No. 1-10 at 1. On April 30, 2018, Plaintiff's Unit Manager accepted the grievance. Id. On May 10, 2018, Plaintiff appealed. Id. On May 15, 2018, the Warden responded "Level One Response is affirmed. Thank you." Id. The grievance was denied in the Central Office. Id. Attached to the grievance is a note from James F. Gray, H.S.A., stating

> [t]his is in response to your grievance dated 4/27/2018. After reviewing your grievance, I found that you are on the list to see Dr. Patel about this issue. I want the staff to act professional at all times and will remind them of the procedures for emergencies and injuries.

Id. at 2.

> On April 27, 2018, Plaintiff filed a third grievance, stating that

> Wexford Medicals [sic] nurse practitioner Pam was deliberately indifferent to me and my head, neck, back, finger injuries releasing me from Med Cell 3 on 4/17/18 w/o any type of evaluation or even ask n [sic] me how I felt. Since then my back is still causen [sic] me pain & numbness and I have major headaches every day. They told me before I could leave medical that I had to see Pam for an evaluation on my injuries."

ECF No. 1-11 at 1.  On April 30, 2018, Plaintiff's Unit Manager accepted the grievance, noting "see attached." Id. On May 10, 2018, Plaintiff appealed. Id. On May 15, 2018, the Warden responded: "[p]lease refer to answer received at Level One by HSA (Wexford) James Gray → that answer is affirmed. Thank you." Id. The Central Office affirmed the denial of the grievance. Id. Attached to the grievance is a May 4, 2018 note to Plaintiff from James F. Gray, H.S.A., stating in pertinent part that:

> This is in response to your grievance dated 4/27/2018. After reviewing your grievance, I found that there is documentation stating that you were seen by NP Pam Moore about this issue before being released to go back to your pod . . .

> Author: Moore, FRNP, Pamela
> Date: 4-20-2018 1253

Note: Late entry: seen on 4/18/18 index finger of left hand bruised between 1st and 2nd knuckle, mild swelling. Full rom[6] to all fingers bilateral hands. Ambulates with steady gait. IM requesting to go back to pod. Released from medical.

Highlight note? No
Related problems: (none)

Id. at 2.

On May 17, 2018, Plaintiff filed another grievance, stating

I have been putting sick call after sick call in repeatedly for my chronic back issues that they say I have that were reinjured when I fell on 4/16/16. I also injured my head and finger and neck. These injuries are not going away or getting any better. My headaches are still there. I cannot use my finger and my lower back is killing me w/ pain and my legs are going numb. Please do something.

Id. at 3. Under relief, Plaintiff wrote "I want my injuries fixed or at least made to where I am not in so much pain and suffering and can sleep all night and be active w/o chronic pain and numbness." Id. Plaintiff's Unit Manager accepted the grievance on May 18, 2018, noting "see attached." Id. Plaintiff appealed to the Warden on May 24, 2018. Id. On May 29, 2018, the Warden responded: "[c]linical decisions are the sole province of the responsible health care practitioner and are not countermanded by non clinicians." Id.  The Central Office affirmed the denial of the grievance. Id. Attached to the grievance is a May 23, 2018 note from James F. Gray, H.S.A., stating that "[t]his is in response to your grievance dated 5/17/2018. After reviewing your grievance, I found that you have been seen for your issues by the Nurse Practitioner on 5/23/2018." Id. at 4.

On May 24, 2018, Plaintiff filed another grievance, stating

Opon [sic] further review of grievance #18.NA.C-2.5C9 I am sorry to report that on Wednesday the 23rd of May I wasn't seen by anyone in Medical. A quick review of the camera will show you that it doesn't matter what is written down in your logs, cameras don't lie[,] Mr. Gray. I can't believe that they are lieing [sic] to you and saying that they seen me[.]

---

[6] "ROM" is a medical abbreviation for "range of motion."

Id. at 5. On May 31, 2018, Plaintiff's Unit Manager accepted the grievance, noting "see attached."

Id. Plaintiff appealed to the Warden on June 8, 2018. Id. On June 12, 2018, the Warden responded:

"[c]linical decisions are the sole province of the responsible health care practitioner & are not

countermanded by non-clinicians." Id. The grievance was denied by the Central Office. Id.

Attached to the grievance is a June 6, 2018 note to Plaintiff from James F. Gray, H.S.A., stating in

pertinent part that

> [t]his is in response to your grievance dated 5/24/2018. After reviewing your
> grievance, I found that you were sent on 6/6/2018 for an MRI. The following is an
> excerpt from your chart concerning your finger:
>
> Date: 5/24/2018 11:14 Author: Moore, FRNP, Pamela
>
> IM to medical for xray of hand, due to ongoing complaints of ring finger pain[7] s/p
> fall over a week ago. Ambulating with steady gait, no limp, guarding, facial
> grimacing or appearance of pain. Escorted by 2 officers. IM has continued
> complaints of back pain with spasms, and numbness to both legs. Collegial has been
> submitted.[8] legs. Collegial has been submitted.  ←

Id. at 6.

Plaintiff's deliberate indifference claims against Defendants Moore and Gray will be

addressed separately below.

**1) Defendant Moore**

Defendant Pamela Moore is identified in Plaintiff's complaint as "Nurse

Practitioner/FRNP." ECF No. 1 at 3. The Defendants' memorandum in support of its dispositive

motion does not dispute this.

---

[7] Plaintiff's fall-related complaint of finger pain was an injury to his left index finger, not his ring finger.

[8] Wexford's Collegial Review Committee decides whether a consultation with an outside specialist is warranted for a particular inmate. When a physician makes a non-emergent referral for an inmate, the referral is evaluates within a week from the time it is made, during a weekly scheduled call, and when a referral is urgent, a provider can request an earlier appointment for a collegial review, subject to availability. See Baker v. Wexford Health Sources, Inc., 118 F.Supp.3rd 985, 999 - 1000 (N.D. Ill. Jul. 28, 2015).

Plaintiff's July 5, 2018 complaint alleges that Defendant Scott, an LPN, witnessed his April 16, 2018 fall but then refused to give him an immediate evaluation because she had to complete pill call for other inmates first.  Instead, the complaint alleges, after speaking to him, Scott had him put back in his cell to wait "for over 30 minutes" for her to return and examine him. ECF No. 1 at 11. During this time, he alleges he "lost consciousness and woke up on the floor" and also vomited. Id.  However, the undersigned notes that the grievance Plaintiff filed on April 18, 2018, only two days after the fall, when presumably his memory would have been freshest, makes *no mention* of having lost consciousness, fallen again, and/or having vomited when he was left alone to wait; Plaintiff's only complaint was that he was left alone to wait "over 30 minutes" while suffering blurred vision, ringing in his ears, and back pain. ECF No. 1-8 at 1. However, nine days later, in an April 27, 2018 grievance, Plaintiff complained that Defendant Scott was deliberately indifferent to him "by *throwing me back into my cell* [to wait] . . . after witnessing me fall[;]" making him wait "over 30 minutes" while he was experiencing blurred vision and nausea, and that while he waited, he *lost consciousness twice* and vomited. ECF No. 1-9 at 1 (emphasis added). Finally, Plaintiff's October 28, 2019 response in opposition contends that he was left alone in his cell after the fall for "*nearly 45 minutes*," where he passed out, fell again, and *vomited twice* while waiting for help. ECF No. 37-1 at 1. It appears that Plaintiff's description of the severity of his symptoms during this time has evolved over time.

Nonetheless, the record is devoid of any specifics provided by either party as to what Plaintiff's April 16, 2018 injuries from the fall actually were, beyond the general description of "injuries" to Plaintiff's head, neck, spine, finger, lower back and leg. ECF No. 1 at 9. Therefore, it is impossible to determine whether Plaintiff did in fact suffer a "serious" medical need, i.e., one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

attention, or an injury diagnosed by a physician as mandating treatment. Plaintiff's complaint does not allege any fracture, laceration, strain or sprain to any part of his body, nor does it allege he suffered a concussion; admittedly, while his response in opposition contends that he was suffering "symptoms of" concussion [ECF No. 37-1 at 1], it falls short of alleging he was ever actually *diagnosed with* concussion.

However, assuming *arguendo* that Plaintiff did in fact suffer a concussion, a serious medical need that would satisfy the objective element, Plaintiff's complaint, his grievances and the responses thereto, and the affidavits of the two prisoners who state they witnessed the fall establish that Plaintiff was immediately, if briefly, seen by Defendant Scott; was taken to medical by wheelchair within 30 minutes to receive a full evaluation, and as a result of that evaluation, Plaintiff was  kept overnight in medical for observation, "just in case," because of his initial complaints of blurred vision, ringing in his ears, and back pain. While Plaintiff disputes Defendants' contention that this was appropriate and adequate care, the record indicates that he was repeatedly evaluated several times throughout the night (by Plaintiff's description, by an "unknown nurse"); and that by around 5:45 a.m., he complained only of swelling and bruising to the left index finger and was already requesting to be released back to his cell because his symptoms had subsided. ECF No. 1-8 at 2.  Notably, Plaintiff's subsequent grievances never disputed that this was untrue.  Moreover, per Plaintiff's own admission, he was *not* released to his cell the following morning; he was only sent back to his cell at 1:15 p.m. that day [ECF No. 1-4 at 1], implying that the health care staff kept him longer than he preferred, presumably for continued observation, hardly evidence of deliberate indifference.

Likewise, Plaintiff's contention that he never received an evaluation by Moore before being released back to his pod is undercut by Plaintiff's own admission in his response in opposition,

which states that in medical, the morning after the fall, medical staff told him he was "fine," and

that Moore told him what he was experiencing was normal for a fall injury [ECF No. 37-1 at 2],

indicating that Moore did in fact see him before he was released to go back to his cell.  Further,

the response to his April 27, 2018 grievance complaining of the same attaches an excerpt from his

medical record showing that on April 18,[9] 2018, before releasing him from medical, Moore

examined him and noted that  he had bruising and swelling of his left index finger between the

first and second knuckle, but full range of motion to all fingers on both hands; was able to walk

with a steady gait; and was requesting to be released. ECF No. 1-11 at 2.

A careful review of Plaintiff's contemporaneously-filed grievances and responses reveals

that Plaintiff was checked briefly by Defendant Scott, an LPN, immediately after the fall; fully

evaluated by Scott in medical within a half hour after the fall; despite the evaluation's conclusion

that he was "fine," he was still kept overnight in medical by orders from Defendant Moore for

observation, "just in case [ECF No. 37-1 at 1]," (implying that there was no apparent serious injury

but that Plaintiff was kept overnight based on his subjective, reported symptoms); and not released

until 1:15 p.m. the next day, despite his wanting to leave seven and a half hours earlier  because

his symptoms had subsided.

Subsequently, despite Plaintiff's claims that his medical needs for follow up care were

ignored, over the course of the next few weeks, he was seen by the nurse practitioner, at least twice

by doctors; had an x-ray of his back some time before April 27, 2018; on May 24, 2018, had an x-

ray of his hand and was referred  to "collegial" to evaluate his complaints regarding to his legs;[10]

---

[9] It is unclear from the record if this date was a typographical error; nonetheless, as noted *supra*, Plaintiff's own response in opposition admits that he was seen by Moore in the morning before being released on April 17, 2018 to return to his cell.

[10] Notably, the May 24, 2018 referral to "collegial" was made despite the fact that Plaintiff was observed ambulating with a steady gait, without limping, guarding, facial grimacing, or any appearance of pain to support his claims of back pain and numbness in his legs. See ECF No. 1-11 at 6.

and was sent out for an MRI on an unspecified part of his body on June 6, 2018. Although the record does not include what the results of that "collegial" referral or the MRI were, presumably, by the time Plaintiff filed his response in opposition over a year later, he was certainly privy to the results of both, and yet he still failed to allege that any serious condition was ever found. Therefore, it seems likely that despite Plaintiff's claims to the contrary, his fall-related injuries were not sufficiently serious to cause a lifelong handicap or permanent loss. Further, the fact that he was referred to "collegial" and sent out for the MRI on June 6, 2018 refutes his own claim that the health care defendants tried to 'cover up' his injuries by refusing to refer him to outside providers.

The grievances/responses establish that Plaintiff was immediately but briefly examined after the fall and then received a full evaluation in medical within approximately 30 minutes. A mere delay in providing medical treatment does not give rise to a constitutional violation without showing some substantial harm to the inmate. Williams v. Miles, 2009 U.S. Dist. LEXIS 57833 at *2. Here, Plaintiff has shown neither.

The record also reveals that Plaintiff was repeatedly scheduled for medical visits in response to his requests, was seen by providers, and provided diagnostic testing. An inmate cannot establish a claim of deliberate indifference when the relevant medical records demonstrate that the inmate received continuous and reasonable care for his medical conditions. See Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998) (missing diagnosis of pituitary tumor which led to inmate's loss of sight did not amount to deliberate indifference when physicians treated symptoms presented by inmate and consulted with specialists); Davis v. Williamson, 208 F. Supp. 2d 631 (N.D. W.Va. 2002) (Maxwell, J.) (finding no evidence of deliberate indifference where medical records showed that the inmate was examined and treated by medical staff on numerous occasions for all of his complaints). Even if his unspecified injuries had constituted the objective element of serious

medical needs, Plaintiff cannot satisfy the subjective element, and therefore, he fails to establish an Eighth Amendment violation. Mere disagreement with medical staff's decisions regarding the timing, treatment, diagnostic testing, and/or necessity for referral to outside physician(s) of an inmate's choice does not support a claim of cruel and unusual punishment. See Russell v. Sheffer, 528 F.2d at 319.

Plaintiff's speculative contention that Moore's refusal to treat him was a result of a desire to conceal the true nature and extent of his injuries to protect C.O. Folmer or his fiancé is insufficiently pled and has no support in the record, given that he received a referral to "collegial" and an MRI, which would have been performed at an outside facility.

Based upon the record before the undersigned, the plaintiff has failed to establish that Moore, a Wexford employee, was deliberately indifferent to any of his serious medical needs. Because the plaintiff has not shown that Moore violated his constitutional rights, Moore is entitled to qualified immunity. See Wilson v. Layne, 526 U.S. at 609.

**2) Defendant Gray**

Defendant Jamie Gray is identified in Plaintiff's complaint as the Medical Administrator for Wexford at NCF. ECF No. 1 at 3. The Defendants' memorandum in support of its dispositive motion does not dispute this.

It is undisputed that Gray was the Medical Administrator for Wexford at NCF. A government official is only liable for his own misconduct. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011) (citations omitted); Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009); Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (citations omitted). In a § 1983 civil rights action, a plaintiff must make clear exactly who is alleged to have done what to whom, as distinguished from collective allegations against the government generally. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 565

n. 10 (2007). Because a government official is only liable for his own personal misconduct, a supervisory defendant is not vicariously liable for the misconduct of subordinate employees. Ashcroft v. Iqbal, 556 U.S. 662, 676-77 (2009); Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001). Vague allegations that a supervisor was aware of subordinate misconduct are insufficient to independently support liability. See Patel v. Moran, 897 F.Supp.2d 389, 401 (E.D. N.C. 2012).

Plaintiff's complaint generally contends that Defendant Gray was deliberately indifferent to his serious medical needs. However, nowhere does the complaint make any specific allegation regarding anything that Gray ever personally actually did to prevent Plaintiff from receiving timely or proper care. In his response in opposition, Plaintiff finally alleges that Gray had a "sufficiently culpable" state of mind because Gray tried to downplay his medical issues, and refused to refer him to outside providers for fear that such a referral would result in diagnosis of Plaintiff's medical issues, and expose Gray's attempts to cover up Plaintiff's injuries. See ECF No. 37-1 at 1- 2.

It is apparent from a careful review of the record that Plaintiff has not alleged that Gray had any involvement in his failure to receive immediate post-fall care;  care during his overnight observation in medical the night of the fall; or the decision to release him from medical the next day while Plaintiff alleges he was still symptomatic. Plaintiff's sole claim against Gray, which he failed to raise with sufficient specificity in the complaint, appears to be that Gray somehow interfered with Plaintiff getting outside referrals to diagnose his fall-related injuries in the days or weeks after the fall, a claim that has already been shown to be refuted by the record, *supra*.

However, when deciding a Rule 12(b)(6) motion to dismiss, the district court is limited to the allegations set forth in the complaint. See Kennedy v. Chase Manhattan Bank, 369 F.3d 833, 839 (5th Cir. 2004); *cf*. Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984) (explaining that "it is axiomatic that the complaint may not be amended by the briefs in opposition

to a motion to dismiss"); see also Agnew v. NCAA, 683 F.3d 328, 348 (7th Cir. 2012) (It is improper to amend a complaint via a response to a motion to dismiss); see also Brown v. United States DOJ, 1:17cv144, 2019 U.S. Dist. LEXIS 44806, *24 - 25 (N.D. W.Va. Jan. 23, 2019), adopted by Brown v. United States DOJ, 2019 U.S. Dist. LEXIS 43936, Keeley, I.M. (N.D. W.Va. Mar. 18, 2019).

Further, a complaint must include "more than labels and conclusions, and  a formulaic recitation of the elements of a cause of action will not do . . . " Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. Here, Plaintiff's complaint has not asserted any factual allegation against Gray that meet the "heightened pleading standard" required in actions against government officials, or that would give rise to relief above a speculative level, to establish a constitutional violation, let alone any injury or harm. Therefore, Plaintiff's claims against Defendant Gray must fail.

## V. **Recommendation**

In consideration of the foregoing, it is the undersigned's recommendation that Defendant Gray and Moore's Motion to Dismiss [ECF No. 30] be **GRANTED,** and that they be **DISMISSED with prejudice from this action for the failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. 1915(e)(2)(ii)**.

Further, the undersigned **RECOMMENDS** that Defendant Gray and Moore's pending Motion to Strike Duplicative Pleading [ECF No. 43] be **GRANTED**.

**Within fourteen (14) days** after being served with a copy of this Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which the objections are made. Objections shall identify each portion of the

magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.   Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12. A copy of such objections should also be submitted to the United States District Judge.

**Failure to timely file objections as set forth above will result in waiver of the right to *de novo* review by this Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

DATED: July 6, 2020

/s/ *Michael John Aloi*

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE