IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**JOSHUA DANIEL STEVENS,**

  **Plaintiff,**

v.                                                        **Civil Action No. 1:18cv140**
                                                          **(Judge Kleeh)**

**BETSY JIVIDEN; KAREN**
**PSZCOLKOWSKI; WILLIAM**
**YURCINA; MIKE HILL; RICHARD**
**MCKEEN; RUSSELL COOK;**
**CHRISTOPHER FOLMER;**
**and MICHELLE SCOTT,**

  **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

The *pro se* Plaintiff, an inmate then-incarcerated at the Northern Correctional Facility[1]

("NCF") in Moundsville, West Virginia, filed this civil rights action[2] pursuant to 42 U.S.C. § 1983

on July 5, 2018. ECF No. 1. Plaintiff has been granted permission to proceed *in forma pauperis*

and paid an initial partial filing fee.  ECF Nos. 7, 9. On November 30, 2018, a Miscellaneous Case

Order was entered, reassigning this case from Senior District Judge Irene M. Keeley to District

Judge Thomas S. Kleeh.  ECF No. 11. On January 28, 2019, Plaintiff filed copies of sworn

affidavits by two other inmates. ECF No. 12.

---

[1] Plaintiff is presently incarcerated at Mt. Olive Correctional Center ("MOCC") in Mt. Olive, West Virginia.

[2] The defendants are of two groups, current/former employees of Wexford Health Sources, Inc. ("Wexford") and current/former employees of the West Virginia Division of Corrections and Rehabilitation ("WVDOC"), and therefore, they will be referred to collectively hereinafter as the "Wexford Defendants" and the "WVDOC Defendants."

On August 21, 2019, an initial review pursuant to Local Rule of Prisoner Litigation Procedure ("LR PL P") 2 was conducted and the Defendants were ordered to answer the complaint. ECF No. 14.  Summonses were issued for the named defendants. Id. On September 18, 2019, the United States Marshal Service ("USMS") notified the *pro se* law clerk ("PSLC") assigned to this case that the USMS were unable to serve Defendant Yurcina at the address provided in Plaintiff's complaint; by Order entered September 18, 2019, that summons was reissued.  ECF No. 18. On September 20, 2019, the original summonses for Defendant Scott and Yurcina were returned unexecuted; all other summonses were returned as executed. ECF Nos. 21 – 29.

On September 26, 2019, Defendants Gray and Moore filed a Motion to Dismiss with a Memorandum in Support [ECF Nos. 30, 31]; because Plaintiff was proceeding *pro se*, on September 30, 2019, a Roseboro Notice was issued, advising him of his right to respond to the dispositive motion.  ECF No. 33. On October 1, 2019, the reissued summons for Defendant Yurcina was returned executed. ECF No. 35. On October 28, 2019, Plaintiff moved for an extension of time in which to respond to the Roseboro Notice, attaching a response in opposition. ECF No. 37. On November 5, 2019, Defendants Gray and Moore filed a reply to Plaintiff's response in opposition. ECF No. 38. By Order entered the same day, Plaintiff's motion for an extension of time was granted. ECF No. 39. On April 7, 2020, Plaintiff filed a duplicate copy of his original response in opposition. ECF No. 41. On April 9, 2020, Defendants Gray and Moore moved to strike the duplicative pleading. ECF No. 43. By Order entered April 14, 2020, counsel for the Wexford defendants was directed to provide an address at which Defendant Scott could be served. ECF No. 44. The same day, the Clerk was directed to reissue summonses for the WVDOC defendants and the USMS were directed to effectuate proper service. ECF No. 45. The summonses were reissued the same day. ECF No. 46.

On April 16, 2020, Plaintiff filed a response to Defendants Gray and Moore's motion to strike. ECF No. 47.  On April 21, 2020, the WVDOC defendants filed a Motion to Dismiss with a memorandum in support. ECF Nos. 48, 49. The summons for Defendant Scott was reissued the same day. ECF No. 50. A second Roseboro Notice was issued on April 22, 2020. ECF No. 51. On May 12, 2020, Defendant Scott filed a Motion to Dismiss with a memorandum in support. ECF No. 55, 56.  A third Roseboro Notice was issued May 13, 2020.  ECF No. 57.  On May 14, 2020, Plaintiff moved for appointed counsel, or alternatively, to stay the case. ECF No. 59. The reissued executed summonses for the remaining six of the seven WVDOC defendants and defendant Scott were docketed the same day. ECF Nos. 60 – 65. By Order entered May 20, 2020, Plaintiff's letter motion to appoint counsel was denied without prejudice and his alternative motion to stay the case was construed as a motion to extend the time in which to respond to the remaining two dispositive motions and granted. ECF No. 67.

On June 2, 2020, Plaintiff moved for reconsideration of the Order denying appointed counsel.  ECF No. 69. By Order entered June 4, 2020, the motion to reconsider was denied. ECF No. 70. On June 5, 2020, the summons for Defendant Jividen was returned executed.  ECF No. 71. On June 16, 2020, Plaintiff moved again for appointed counsel or alternatively, for a further extension of time. ECF No. 73. By Order entered June 18, 2020, Plaintiff's third letter motion to appoint counsel was denied in part without prejudice, and his alternative motion for a third extension of time was granted in part. ECF No. 74.

On July 6, 2020, a preliminary Report and Recommendation addressing only the claims against Wexford Defendants Gray and Moore was entered, recommending that the claims against Defendants Gray and Moore be dismissed.  ECF No. 76.  Plaintiff did not file objections. By Order Adopting Report and Recommendation entered August 4, 2020, the Preliminary Report and

Recommendation was adopted; Gray and Moore's Motion to Dismiss was granted, all claims against them were dismissed with prejudice and they were dismissed from this action, and their Motion to Strike Duplicative Pleading was granted. ECF No. 78.

Plaintiff did not file any response in opposition to Defendant Scott's or the WVDOC Defendants' dispositive motions.

Accordingly, the case is again before the undersigned for review and report and recommendation, pursuant to LR PL P 2.

## II. Contentions of the Parties

### A. Plaintiff's Complaint

This Report and Recommendation will address Plaintiff's claims against the remaining Wexford Defendant, LPN Michelle Scott[3] ("Scott"), and the seven current/former WVDOC employees: Defendant C.O. Christopher Folmer ("Folmer"), WVDOC Commissioner Betsy Jividen ("Jividen"), Warden Karen Pszcolkowski ("Pszcolkowski"), Deputy Warden William Yurcina[4] ("Yurcina"), Associate Warden of Security ("AWS") Mike Hill ("Hill"), Shift Supervisor Richard McKeen ("McKeen"); and C-2 Pod Supervisor Russell Cook ("Cook").

Plaintiff raises an Eighth Amendment claim of deliberate indifference against Defendant Folmer for failing to adhere to WVDOC's policy on escorting inmates in mechanical restraints. Plaintiff avers that on or about April 16, 2018 at the NCF, Folmer was escorting Plaintiff down a stairwell to the shower while Plaintiff was wearing mechanical restraints with his hands secured behind his back. ECF No. 1-1 at 2. Plaintiff fell, sustaining unspecified head, neck, spine, finger, lower back and leg injuries. Id.; see also ECF No. 1 at 9 - 10.

---

[3] Scott is no longer a Wexford employee.

[4] Yurcina has retired from service with the WVDOC.

Plaintiff also raises a supervisory liability claim against the WVDOC defendants Jividen, Pszcolkowski, Yurcina, Hill, McKeen, and Cook, for their failure to supervise, train, and discipline C.O. Folmer on how to properly escort inmates in mechanical restraints. ECF No. 1 at 10.

Further, Plaintiff contends that when he exercised his First Amendment rights to free speech and to petition the court by filing grievances alleging that his injuries occurred because the defendants were not doing their jobs, Defendants Cook and Folmer told the other segregation unit inmates that the reason their showers were late was because Plaintiff was a whistleblower, which caused him to be labeled as a rat, targeted by other inmates who threatened him, endangering his life. Id. at 10 – 11.

Plaintiff also raises Eighth Amendment claims of deliberate indifference to serious medical needs against Defendant LPN Michelle Scott ("Scott") arising out of the denial of timely and adequate medical care for his fall-related injuries.  Id. at 11.

Plaintiff also raises a Fourteenth Amendment claim, alleging that his due process rights were violated when his request for protective placement in a Special Management Unit ("SMU") was denied. Id. at 12. Plaintiff contends that as a witness against three violent inmates, he sought protection in the SMU but it was denied. Id. Plaintiff claims that this denial of SMU placement violated a protected liberty interest under both the West Virginia Constitution, the Eighth Amendment, and WVDOC Policy Directive 326.03.[5] Id.

Plaintiff contends that he exhausted his administrative remedies. ECF No. 1 at 5.

---

[5] The undersigned notes that Policy Directive 326.03 Special Management Status," referenced by Plaintiff provides that the "Northern Regional Jail and Correctional Facility (Level V) is designated as a Special Management Facility for male Division of Corrections' inmates who can be reintegrated into the general population."

Plaintiff states that as a result of the Defendants' improper behavior, in addition to the physical injuries to his head, neck, spine, finger, lower back and leg injuries, he experienced pain, suffering, emotional and psychological distress. Id. at 9 - 10.

As relief, Plaintiff seeks "nominal" damages of $10,000.00 against each defendant, jointly and severally; and compensatory damages of $25,000.00, jointly and severally against each defendant, and punitive damages of $150,000.00 against each defendant, jointly and severally. Id. at 9. He also requests to be released from segregation. ECF No. 1-1 at 2.

Attached to Plaintiff's complaint are copies of grievances and responses on multiple issues, [ECF Nos. 1-1 – 1-13]; and copies of two sworn affidavits from Plaintiff regarding three inmates who attacked an extorted an inmate at NCF. See ECF Nos. 1-15, 1-14.

Subsequent to the filing of his complaint, Plaintiff filed copies of sworn affidavits from two other inmates, Devin Thaxton ("Thaxton") and David Dean Buzzard ("Buzzard"). See ECF Nos. 12 and 12-1.  Thaxton's affidavit stated in pertinent part that:

> . . . [o]n or about April 16, 2018 I was housed in the NCF segregation unit (C2-CELL-7). During P.M. segregation showers Correctional Officer Folmer did stop escorting inmate Joshua Stevens on the top tier and began having a conversation with me at my cell door.  While inmate . . . Stevens was wearing mechanical restraints, with his hands secured behind his back, he did fall down the stairs. The only reason . . . Stevens fell down the stairs is because C.O. Folmer deliberately failed to escort him while he was wearing the mechanical restraints. When . . . Stevens fell I did see him strike his head on the floor of the top tier . . . Stevens did request to go to medical and nurse Michelle Scott did tell him, at the stairs, that she had to complete pill call before she could asses him . . . Stevens was complaining of head pain, pain in one of his fingers, back pain and I heard him say that he was dizzy and his ears were ringing. He was then placed back in his cell and the nurse left the unit.

ECF No. 12 at 1 – 2. Buzzard's affidavit stated in pertinent part that

> . . . [o]n or about April 16, 2018, I was housed in the segregation unit at NCF (C2-CELL-32). From my cell I did have an unobstructed view of the stairs which lead to the top tier of the segregation cells which is located in close proximity to segregations cells 1 through 16. At approximately 6:00 P.M., during segregation

shower time, I did witness inmate Joshua Stevens, who was wearing a pair of mechanical restraints, with his hands secured behind his back, fall down the stairs from the top tier. During this time Correctional Officer Folmer was not escorting . . . Stevens, which resulted in . . . Stevens tripping over his shower sandals and falling down the stairs. Because officer Folmer was not escorting . . . Stevens . . . Stevens was forced to attempt to stop himself from falling down the stairs. . . Stevens did attempt to stop himself . . . by grabbing the railing . . . which was attached to the wall. Due to . . . Stevens' hands being secured behind his back . . . his left index finger was injured when he was forced to essentially save himself from falling down the entire flight of stairs. All of this resulted from C.O. Folmer's deliberate failure to escort . . . Stevens. I . . . saw . . . Stevens fall down the stairs. While falling, he managed to turn his body to the position facing the top of the stairs and lean forward toward the landing in order to save himself from falling down the entire flight of stairs . . . As a result of . . . Stevens wearing . . . restraints[] with his hands secured behind his back, he had no way to break his fall and as a result, he struck his head on the floor of the landing at the top of the stairs. . . . Stevens requested medical attention, medical came to his location at the bottom of the C2 stairs and nurse Michelle Scott[] spoke to him for approximately 5 to 10 seconds and left. . . Stevens was then placed in his cell and about 30 minutes later medical returned and he could not walk on his own so he was placed in a wheelchair and taken to medical. After . . . Stevens left the pod, I went to sleep.

ECF No. 12-1 at 1 –3.

## B. Motion to Dismiss by Defendants Jividen, Pszczolkowki, Yurcina, Hill, McKeen, Cook and Folmer

Defendants Jividen, Pszczolkowki, Yurcina, Hill, McKeen, Cook and Folmer argue that

Plaintiff's claims against them should be dismissed, contending that:

1) Plaintiff's deliberate indifference claim against Defendant Folmer fails to state a claim upon which relief can be granted;

2) Plaintiff's "failure to train" claims against Defendants Jividen, Pszczolkowski, Yurcina, Hill, McKeen, and Cook fail to state a claim upon which relief can be granted;

3) Plaintiff's retaliation claim against Defendants Cook and Folmer fails to state a claim upon which relief can be granted;

4) Plaintiff's claims related to his application for "Special Management" fail to state a claim upon which relief can be granted;

5) to the extent plaintiff alleges claims against the Northern Regional Jail, those claims are barred as a matter of law; and

6) all defendants are entitled to qualified immunity against Plaintiff's claims. ECF No. 49 at 3 – 14.

## C. **Defendant Michelle Scott's Motion to Dismiss**

Defendant Scott argues that the case should be dismissed as to her because Plaintiff has failed to allege a sufficient factual predicate to state a claim of deliberate indifference; Scott argues that Plaintiff does not even clearly allege any act on her part, attributing certain acts to an unnamed nurse.  ECF No. 56 at 6.  Scott argues that even if the Court were to assume that all of the acts attributed to this unnamed nurse could be attributed to her, it would still not state a claim for deliberate indifference. Id. She contends that the most reasonable interpretation of Plaintiff's claim against her is for a *de minimis* 30-minute delay in medical care, which does not state an Eighth Amendment violation. Id.

Finally, Scott contends that she is entitled to qualified immunity. Id. at 8.

## III. **Standard of Review**

### A. **Section 1983 Claims**

Plaintiff is seeking relief pursuant to 42 U.S.C. § 1983. ECF No. 51 at 1. Section 1983 states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983.

### B. **Sufficiency of a Complaint**

Whether a complaint is legally sufficient is measured by whether it meets the standards for a pleading stated in the Federal Rules of Civil Procedure. See Fed.R.Civ.P.8 (providing general

rules of pleading), Fed.R.Civ.P.9 (providing rules for pleading special matters), Fed.R.Civ.P.10 (specifying pleading form), Fed.R.Civ.P.11 (requiring the signing of a pleading and stating its significance) and Fed.R.Civ.P.12(b)(6) (requiring that a complaint state a claim upon which relief can be granted). <u>See</u> <u>Francis v. Giacomelli</u>, 588 F.3d 186 (4th Cir. 2009).

Although Fed.R.Civ.P.8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. <u>Randall v. United States</u>, (4th Cir. 1996). <u>See also</u> <u>Dunbar Corp. v. Lindsey</u>, 905 F.2d 754, 764 (4th Cir. 1990).

## C. <u>Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(6)</u>

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a case when a complaint fails to state a claim upon which relief can be granted. Dismissal under Rule 12(b)(6) is inappropriate unless it appears beyond doubt that the plaintiff cannot prove any set of facts to support his or her allegations. <u>Revene v. Charles County Comm'rs.</u>, 882 F.2d 870 (4th Cir. 1989). Courts, however, are not required to accept conclusory allegations couched as facts and nothing more when ruling on a motion to dismiss pursuant to 12(b)(6). A complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u> In addition to pleading sufficiently specific factual allegations, a plaintiff must assert a plausible claim in the complaint that is based on cognizant legal authority. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." <u>Id.</u>

Because Plaintiff is proceeding *pro se*, the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); Haines v. Kerner, 404 U.S. 519 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leeke, 574 F.2d 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, Haines, 404 U.S. at 520, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Id. at 520-21. The mandated liberal construction means only that if the Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so. Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999). However, a court may not construct the plaintiff's legal arguments for him or her. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## IV. Analysis

### A. Deliberate Indifference

Plaintiff contends that Defendant Folmer exhibited deliberate indifference toward his safety when he failed to adhere to an unspecified WVDOC policy on escorting inmates in mechanical restraints, because Plaintiff fell on  the stairs on April 16, 2018 while Folmer was escorting him while he was wearing mechanical restraints with his hands secured behind his back. ECF No. 1-1 at 2.

Plaintiff attaches a copy of an April 18, 2018 grievance, which states in pertinent part that Folmer was "deliberately indifferent to a known risk of harm to myself when he failed to adhere to WVDOC policy directives and/or NCF operational procedures which govern the escort of segregation inmates who are wearing mechanical restraints." ECF No. 1-1 at 2. The Unit Manager's April 19, 2018 response to the grievance stated "[**t**]**he reports on this incident state**

**that you walked away from the officer as he ordered you to stop**. I will review this and take the appropriate steps/action." Id. at 1 (emphasis added). The Warden's April 26, 2018 response, denying the grievance, was that "AWS is looking into the escorting procedures of seg inmates. He is reviewing this spea__n [illegible] issue. Thank you." Id.

Defendants contend that Plaintiff's allegations are insufficiently pled and fail to identify what policy directives or operational procedures Folmer violated, let alone offer any facts which would indicate how Folmer failed to adhere to regulations while escorting him. ECF No. 49 at 3. Moreover, they note that precedent in this Court is that falling down stairs while shackled, without more, does not rise to the level of a cognizable § 1983 claim. Id. at 4. Such claims are merely negligence, and have even been noted to be a result of the Plaintiff's own negligence. Id., citing to Pendergass v. Hodge, 53 F.Supp.2d 838, 842 (E.D. Va. May 17, 1999).

Liability under § 1983 is "personal, based upon each defendant's own constitutional violations." Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001) (internal citation omitted). Therefore, to establish liability under § 1983, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2nd Cir. 1994); Colburn v. Upper Darby Twp., 838 F.2d 663, 666 (3d Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for a violation of a constitutional right under § 1983. Rizzo v. Good, 423 U.S. 362 (1976).

In Pink v. Lester, the Fourth Circuit held that negligent acts or omissions are not actionable under § 1983, and that "courts have repeatedly held that slip and fall cases do not implicate the Constitution." See Pink, 52 F.3d 73, 75 (4th Cir. 1995); Bey v. Bailey, No. 3:11-cv-489-RJC, 2013

WL 2480661, at *2 (W.D.N.C. June 10, 2013) (citing cases).  A review of other similar cases reveals that in Pendergrass v. Hodge, 53 F. Supp. 2d 838 (E.D. Va. May 17, 1999), an inmate's § 1983 Eighth Amendment claim arising out of a fall on stairs while shackled in full restraints, while the officers accompanying him did not remain close enough to him to break his fall was dismissed because the plaintiff failed to allege that the supervisory defendants were personally involved and the doctrine of *respondeat superior* did not apply. Further, the record contained no evidence that the officers escorting plaintiff when he fell were in any way responsible for his fall; the plaintiff tripped and fell while walking in full restraints, an accident that the court held at most was the result of negligence, "perhaps even the plaintiff's negligence," and did not give rise to a constitutional tort. Pendergrass, *supra* at 842.

Similarly, in Martinez v. Correll, 2014 U.S. Dist. LEXIS 112199, 2014 WL 3955073 (E.D.N.C., August 13, 2014), an inmate who slipped, fell and broke his arm stepping into a prison shower, later filed a § 1983 action against the officer who escorted him there, alleging deliberate indifference to his safety and violation of policy for escorting him, handcuffed behind his back, into the shower without keeping a steadying hand on him to ensure that he did not slip. Martinez's failure to protect claim was found to be "at most" negligence, which was insufficient to state a § 1983 claim. Martinez, *supra* at * 7.  Similarly, in Daniels v. Williams, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed. 2d 662 (1986), an inmate's § 1983 action alleging a Fourteenth Amendment due process violation after being injured in a fall on stairs[6] caused by a guard's negligently leaving a pillow on the stairway was dismissed after a finding that the due process clause  was not implicated by the guard's negligent acts. Likewise, in Belt v. LeBlanc,[7] a prisoner whose hands

---

[6] Presumably the inmate was not shackled or restrained when he fell; the record makes no mention of it.

[7] Belt v. LeBlanc, No. 3:09-CV-1030, 2011 WL 2460918, Kirk, J.D. (M.D. La. May 13, 2011) *adopted by* Belt v. LeBlanc, 2011 WL 2469829, Trimble, J.T. (M.D. La. June 14, 2011).

were cuffed behind his back while he was escorted between units of a penitentiary, slipped and fell on a wet walkway, injuring his shoulder and knee. Belt filed a § 1983 claim of deliberate indifference to his safety against the guards for restraining him and escorting, but not physically assisting him down the wet walkway. The court found that at best, the guards were merely negligent, and that their actions did not rise to the level of an Eighth Amendment violation. Belt, *supra* at 18.

Likewise, in Pyles v. Gaetz, 2012 U.S. Dist. LEXIS 111705 (S.D. Ill. August 9, 2012), a week after the plaintiff inmate notified the defendant warden, via an administrative grievance, of a potentially dangerous staircase that was constantly wet during the time inmates took their showers, and noted the prison's "unwritten policy/practice requiring inmates to only wear "shower shoes'" while walking to and from those showers, the plaintiff (who was not restrained at the time) then slipped while walking down these same stairs, injuring his neck and spine. Pyle's § 1983 claim of deliberate indifference to an unsafe prison was summarily dismissed because the prison's failure to maintain a dry stairwell did not rise to the level of a constitutional claim.  In a similar case, Foxworth v. Major,[8] a pretrial detainee inmate fell on prison stairs while handcuffed to his cellmate and unescorted by staff. Foxworth's constitutional claim of failure to protect claim was construed there as a conditions of confinement claim,[9] analyzed under the Fourteenth Amendment, and dismissed for failure to state a claim because defendants did not cause him to fall; have any

---

[8] Foxworth v. Major, No. 8:08-2795-CMC-BHH, 2009 U.S. Dist. LEXIS 67277, Hendricks, B.H. (D.S.C. July 8, 2009) *adopted by, summary judgment denied by, summary judgment granted by, claim dismissed by* Foxworth v. Major, 2009 U.S. Dist. LEXIS 66751, Currie, C.M. (D.S.C. July 30, 2009).

[9] "To prevail on a 'conditions of confinement' claim under the Eighth Amendment, an inmate must establish that (1) the condition complained of is 'sufficiently serious' to implicate constitutional protection, and (2) prison officials acted with 'deliberate indifference' to inmate health or safety.'" DeSpain v. Uphoff, 264 F.3d 865, 971 (10th Cir. 2001) (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)(further quotations omitted).

knowledge that he might fall; and Foxworth failed to allege that they knew of and disregarded an excessive risk to his health and safety or that he was deprived a "basic need" by their alleged deliberate indifference. Foxworth, *supra* at * 14 - * 19.  A different outcome reached in a similar case, Anderson v. Morris,[10] is distinguishable from this one.  In Anderson, prison officials who handcuffed an inmate behind his back, ordered him to walk unassisted down an obstacle course of stairs littered with greasy surface food, liquid, and debris, and refused his requests for help, were found deliberately indifferent under the Eighth Amendment to plaintiff's § 1983 claim regarding the obvious risk of harm the stairs posed. In that case, unlike here, Anderson successfully stated an Eighth Amendment claim and alleged circumstances perilous enough to constitute an unreasonable risk of serious damage to his future health.

Here, Plaintiff has not pled sufficient facts to state an Eighth Amendment claim of deliberate indifference to his safety. Plaintiff has failed to show that Folmer acted with a sufficiently culpable state of mind. While Plaintiff makes the conclusory allegation that Folmer was deliberately indifferent [ECF No. 1 at 10], he has not supported it with any evidence whatsoever to show that Folmer acted with any intent to cause him harm. Plaintiff has not alleged that Folmer had any knowledge, prior to the fall, that Folmer knew that the manner in which he was escorting Plaintiff down the stairs could cause Plaintiff injury. To the contrary, the grievance Plaintiff attached to his complaint refutes Plaintiff's own claim: the Unit Manager's response to Plaintiff's grievance on the issue notes that reports of the incident indicate that Plaintiff walked away from Folmer as Folmer ordered Plaintiff to stop, hardly evidence of Folmer's deliberate indifference to the risk of Plaintiff falling.

---

[10] Anderson v. Morris, 835 F.3d 681, 2016 U.S. App. LEXIS 15761 (7th Cir. 2016).

At most, Plaintiff's allegations against Folmer can be construed as negligence, and as noted *supra*, alleged negligence conduct is insufficient to state a § 1983 claim. See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L. Ed. 2d 1043 (1998). Accordingly, this claim against Defendant Folmer should be dismissed for failure to state a claim upon which relief can be granted.

To the extent that the Plaintiff is attempting to allege that Folmer failed to adhere to an unspecified WVDOC policy on escorting inmates in mechanical restraints, the undersigned notes that a Bivens[11] action "must be founded upon a violation of constitutional rights," Arcoren v. Peters, 829 F.2d 671, 676 (8th Cir. 1987), and "a failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater v. Robinson, 1 F.3d 1963, 1068 n. 4 (10th Cir. 1993). See also Cantley v. W. Va. Reg'l Jail & Corr. Facility Auth., 2013 U.S. Dist. LEXIS 143653 * 27 - 28 (S.D. W.Va. October 4, 2013)(even when a state policy is not followed, it does not necessarily mean there is a constitutional violation); Smith v. Atkins, 777 F. Supp. 2d 955, 965 (E.D.N.C. 2011)("the mere failure to comply with . . . [a] state regulation and jail policy [regarding suicide watches] is not a constitutional violation").  The mere violation of a prison regulation does not automatically rise to the level of a constitutional violation cognizable under § 1983. Martinez v. Correll, *supra* at *7, *quoting* Sandin v. Conner, 515 U.S. 472, 481 – 82, 115 S.Ct. 2293, 132 L.Ed. 2d 418 (1995) (stating that prison regulations are primarily designed to guide correctional officials in the administration of a prison and not designed to confer rights on inmates). Therefore, this claim has no merit, either, and should be dismissed for its failure to state claim upon which relief can be granted.

---

[11] Case law under 42 U.S.C. § 1983 is applicable to Bivens actions.  See Butz v. Economou, 438 U.S. 478, 504 (1978).

## B. Failure to Supervise, Train, and Discipline

Plaintiff alleges that Defendants Jividen, Pszczolkowski, Yurcina Hill, McKeen, and Cook (hereinafter "Supervisory Defendants") failed to supervise, train and discipline Defendant Folmer in the proper procedure of escorting inmates in mechanical restraints to and from the showers. ECF No. 1 at 10. Plaintiff's claims against the Supervisory Defendants are made in their individual capacity, except for his claims against Jividen, for whom he alleges them in her individual and official capacity.

Plaintiff attached a copy of an April 21, 2018 grievance he filed, complaining that "[t]he Warden Karen Pszczolkowski, Deputy Warden William Yurcina, AWS Mike Hill, Shift Supervisor Sgt. McKeen, [and] C-2 Pod Corporal Russell Cook failed to supervise and train and discipline C/O Folmer in proper procedure of escorting inmate[s] to and from a shower in mechanical restraints." ECF No. 1-3.  As relief, he sought immediate release from segregation and compensation for his injuries. Id. On April 23, 2018, the Unit Manager responded "[t]his incident is under review and the appropriate steps will be taken." Id. Plaintiff's appeal to the Warden was received on April 23, 2018; on May 1, 2018, the Warden replied "[l]evel one answer affirmed. The AWS is currently reviewing procedures." Id. The grievance was appealed to the Central Office where it was denied. Id.

"Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009). As stated by the Fourth Circuit, because there is no respondeat superior liability under § 1983,  supervisory  liability  lies only  "where  it  is  affirmatively  shown  that  the  official charged acted personally in the deprivation of the plaintiff's rights." Vinnedge v. Gibbs, 550 F. 2d 926, 928 (4th Cir. 1997) (citing

Bennett v. Gravelle, 323 F.Supp. 203, 214 (D. Md. 1971) aff'd 451 F.2d 1011 (4th Cir. 1971);

Harris v. City of Virginia Beach, 11 Fed. Appx. 212, 215 (4th Cir. 2001). Nonetheless, when

a supervisor is not personally involved in the alleged wrongdoing, he may be liable under §1983

if a subordinate acts pursuant to an official policy or custom for which he is responsible. Fisher v.

Washington Metropolitan Area Transit Authority, 690 F. 2d 1133 (4th Cir. 1982) (*abrogated on*

*other grounds by* County of Riverside v. McLaughlin, 500 U.S. 44 (1991)). A plaintiff may

establish deliberate indifference by demonstrating a supervisor's "continued inaction in the face of

documented widespread abuses," however, a plaintiff claiming deliberate indifference "assumes a

heavy burden of proof." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

Plaintiff's claim must be assessed in light of the well-settled standards for Fourteenth

Amendment failures to train and supervise, which appear, respectively, below:

FAILURE TO TRAIN:

[A] failure to train can constitute a "policy or custom" actionable under section
1983 only where the "municipality's failure to train its employees in a relevant
respect evidences a 'deliberate indifference' to the rights of its inhabitants." And
only if, "in light of the duties assigned to specific officers or employees, the need
for more or different training is so obvious, and the inadequacy so likely to result
in the violation of constitutional rights," can a municipality reasonably "be said to
have been deliberately indifferent to that need." Mere negligence is insufficient to
impose section 1983 liability on a municipality for alleged failure to train.

Jordan v. Jackson, 15 F.3d 333, 341 (4th Cir. 1994) (citations omitted).

FAILURE TO SUPERVISE:

In order to succeed on a § 1983 claim for supervisory liability, a plaintiff must
show:

(1) that the supervisor had actual or constructive knowledge that h[er] subordinate
was engaged in conduct that posed "a pervasive and unreasonable risk" of
constitutional injury to citizens like the plaintiff;

(2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and

(3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

As to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury."  As to the second element, a plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Finally, as to the third element, "proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions."

Wilkins v. Montgomery, 751 F.3d 214, 226-27 (4th Cir. 2014) (citations omitted). Here, even liberally construed, Plaintiff's allegations fall far short of the marks established in Jackson and Wilkins.

The undersigned finds that Plaintiff's claims against the Supervisory Defendants fail. Plaintiff asserts no personal or direct involvement on the part of the Supervisory Defendants in the alleged violation of his constitutional rights. Instead, Plaintiff attempts to establish supervisory liability via conclusory allegation, asserting without any evidence to show that these Defendants failed to properly train, supervise and discipline Defendant Folmer. Plaintiff has failed to plead that any of the Supervisory Defendants were actually aware of the risk as required by the deliberate indifference standard. In fact, there are no specific allegations against any of these Defendants other than with respect to the handling of Plaintiff's grievances by Warden Pszczolkowki and/or the Deputy Warden Yurcina, and the adjudication of Plaintiff's appeals of those grievances by Defendant Jividen. At most, Plaintiff has impliedly shown that Warden Pszczolkowki and/or the Deputy Warden Yurcina, and Jividen had actual or constructive knowledge of his injuries from

18

the fall *after* it occurred, by virtue of their review of his grievances about the alleged denial of proper treatment for his injuries from the fall.

Plaintiff has not provided any evidence to show that any of these defendants had any actual or constructive knowledge that Folmer's conduct presented an unreasonable risk of infringing on plaintiff's rights *prior to* Plaintiff's fall. In fact, it seems apparent from the record before the undersigned that the most of the Supervisory Defendants were all likely unaware of and did not become involved in this situation until after it had already occurred. At that time, the plaintiff had already fallen and sustained his alleged injuries. There was simply nothing the Supervisory Defendants could have done at that point.

Plaintiff has not shown that the alleged violations were constitutional in nature nor has he shown that the Supervisory Defendants' responses to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices. Nor has the plaintiff established that any of the Supervisory Defendants tacitly authorized or were indifferent to an alleged violation of his rights. To the contrary, the grievance Plaintiff attached to his complaint shows that Warden Pszczolkowki and/or the Deputy Warden Yurcina, and Jividen considered and responded to his grievance on the issue.[12] Nor has Plaintiff shown that there was any "affirmative causal link" between the supervisor's alleged inaction and the particular constitutional injury he contends that he suffered.

---

[12] To the extent that the plaintiff may be attempting to assert that any of the Supervisory Defendants were deliberately indifferent to his needs by denying his administrative grievances, that claim is without merit because that is not the type of personal involvement required to state a claim. See Paige v. Kuprec, 2003 W.L. 23274357 *1 (D. Md. March 31, 2003).

As noted *supra*, Plaintiff's claims against the Supervisory Defendants are merely conclusory allegations. However, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. See Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994).

Accordingly, the plaintiff has asserted nothing more than a claim that the Supervisory Defendants had a responsibility to intervene in their supervisory or official capacity. However, official capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation and quotations omitted). Therefore, suits against state officials in their official capacities should be treated as suits against the state. Id. at 166.  In order for the governmental entity to be a proper party of interest, the entity's policy or custom must have played a part in the violation.  Id. (citing Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694 (1978).  However, here, the plaintiff fails to assert that any particular policy or custom of the entity played a part in the alleged violation of his constitutional rights.  Accordingly, the plaintiff has failed to state a claim upon which relief can be granted against the Supervisory Defendants, and this claim against them should be dismissed.

## C. **Retaliation**

Plaintiff contends that when he exercised his First Amendment rights to free speech and to petition the court by filing grievances alleging that he was injured because the defendants were not doing their jobs, Defendants Cook and Folmer told the other segregation unit inmates that the reason their showers were late was because Plaintiff was a whistleblower, which caused him to be labeled as a rat, targeted by other inmates who threatened him, endangering his life.

Plaintiff attaches a copy of a grievance filed on April 28, 2018, complaining that Cook and Folmer were telling the other segregation inmates that their showers were late because there were not enough officers to escort them to the showers and up/down the stairs, because Plaintiff wanted to "cry about" his injuries. ECF No. 1-2 at 2.  Plaintiff contends that this "put a target on my back" and the other inmates were calling him "a rat among other choice words." Id.  On Aprile 30, 2018, the Unit Manager responded, stating "I have forwarded a copy of this grievance to the Seg/BHU Commander, Sgt. Colley to address." Id. The appeal of the grievances was received by the Warden on May 9, 2018, and on May 10, 2018, the Warden responded "this issue is being reviewed. Thank you." Id. The grievance was received in the Central Office on May 16, 2018, the earlier decisions were affirmed and the grievance denied. Id.

Liberally construed, it appears that Plaintiff is attempting to allege that Defendants Cook and Folmer retaliated against him for filing grievances.

As an initial point, as Defendants Cook and Folmer noted in their memorandum in support of their dispositive motion, Plaintiff's claim in this regard merely states that they explained to other prisoners, after Plaintiff's fall, that the reason that they could no longer take early showers was because they did not have enough officers to escort them up and down the steps, and that as a result of hearing that, the other inmates were upset with him. ECF No. 49 at 8.  Plaintiff does not allege that the other inmates harmed him as a result, or that he ever actually suffered any damages.  ECF No. 49 at 8 – 9.

The First Amendment protects the right to be free from government abridgment of speech. Prison officials violate an inmate's First Amendment rights when they retaliate against them for filing grievances.  Booker v. S.C. Dep't of Corr., 855 F.3d 533, 543 - 46 (4th Cir. 2017). Further, "[i]t is well settled that state officials may not retaliate against an inmate for exercising his

constitutional rights, including his right to access the courts." Ebersole v. Conover, No. 7:08cv00503, 2010 U.S. Dist. LEXIS 95120, 2010 WL 3629581, at *10 (W.D. Va. Aug. 27, 2010), report and recommendation adopted, No. 7:08cv00503, 2010 U.S. Dist. LEXIS 95078, 2010 WL 3585833 (W.D. Va. Sept. 13, 2010) (citing Am. Civil Liberties Union v. Wicomico Cnty, 999 F.2d 780, 785 (4th Cir. 1993)). However, "bare assertions of retaliation do not establish a claim of constitutional dimension." Boblett v. Angelone, 942 F.Supp. 251, 254 (W.D. Va. 1996), aff'd, 121 F.3d 697 (4th Cir. 1997) (citing Adams v. Rice, 40 F3.d 72 (4th C. 1994). Generally in this circuit, inmates' claims of retaliation are "treated with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting Adams, 40 F.3d at 74 (4th Cir. 1994)).

Therefore, to state a *prima facie* case of retaliation, Plaintiff must present concrete facts corroborating the claim. Here, Plaintiff offers no facts at all to support his allegation of retaliation, beyond conclusory allegations of Cook's and Folmer's nefarious motive in explaining the late showers. The undersigned notes the irony of Plaintiff's simultaneously complaining that safety procedures for escorting shackled inmates on stairs were not adhered to, while ignoring the obvious fact that Cook and Folmer's statements regarding having to delay the segregation inmates' showers was likely a "subsequent remedial measure" enacted by the prison after Plaintiff's fall, to ensure no other prisoners fell. As the Defendants noted, the prison was trying to ensure that sufficient staff were available to bring the shackled inmates up and down the steps.

Plaintiff has failed to state a plausible claim that Cook and Folmer's statements to the other segregation inmates was motivated by retaliation or any other unconstitutional reason; therefore, this claim should be dismissed.

**D. <u>Application for Special Management</u>**

Plaintiff raises three claims against an unspecified "respondent," alleging that his due process rights under the Fourteenth Amendment, his protected liberty interest under both the West Virginia Constitution, the Eighth Amendment, and WVDOC Policy Directive 326.03 were violated when his request for protective placement in the SMU was denied, because as a witness against three violent inmates, he needed protection from them. ECF No. 1 at 12.  In support, Plaintiff references the exhibits docketed as ECF Nos. 1-12 – 1-15.  Plaintiff further contends that because he is incarcerated, he is in a "special relationship" with the state and therefore, "the respondent" had an affirmative duty to protect him from the threat of third-party violence and it failed to do so. ECF No. 1 at 12. Plaintiff references the exhibits docketed as ECF Nos. 1-12 – 1-15 as support for this claim. Finally, Plaintiff contends that he had a protected liberty interest under Article III, § 5 of the West Virginia Constitution, the Eighth Amendment, and WVDOC Policy Directive 326.03, "Special Management." ECF No. 1 at 12.  He asserts that "the respondent blatantly violated" WVDOC Policy Directive 326.03 by denying his request for Special Management. <u>Id.</u>

Attached to Plaintiff's complaint were two sworn affidavits from him. The first is titled "Affidavit of Joshua Stevens," and it states in pertinent part that

> I am an inmate currently housed at the . . . (NCF). In late March to early April, 2017, inmate Josh Morgan (Morgan) asked me to allow inmate David Dean Buzzard, Jr., (Buzzard), to send approximately $550.00 to my mother (Drelene Stevens) off of Buzzard's inmate account. Morgan asked me to have my mother then [send] Western union $500.00 of that money to Morgan's people.  Morgan asked me to have my mother send the money through Western Union, specifying that the money could be picked up without Morgan's people having to show identification.

ECF No. 1-15 at 1.  The other affidavit is titled "Second Affidavit of Joshua Stevens," and states in pertinent part that

23

I am an inmate currently incarcerate at the . . . (NCF). Recently, I filed an affidavit with the court in regards to . . . (WVDOC) inmate Josh Morgan (Morgan) having David Dean Buzzard, Jr. (Buzzard) send approximately $500.00 to my mother in late March to early April, 2017.

On or about April 30, 2018 while housed at NCF, I completed a Special Management Request Form. I requested that keep-aways be placed against WVDOC inmates Larry Cantrell (Cantrell)[,] Josh Taylor (Taylor)[,] and Morgan due to me filing the above mentioned affidavit in regards to Morgan, and because I am going to testify against Cantrell who attacked Buzzard in my presence at NCF on or about June 11, 2016 and I am going to testify to the fact that Morgan and Taylor were extorting Buzzard.

On or about May 4, 2018, Defendant Ryan Adams[13] (Adams) conducted an improper Special Management hearing, by himself, without a Special Management Committee, which is required pursuant to WVDOC Policy Directive 326.03.

I explained to Adams why I needed the keep-aways and Adams refused to grant my request for the keep-aways. Adams stated to me "I am throwing away your Special Management request." Adams then threatened me by stating to me: "If you testify against us, we will send you to Huttonsville where the DMI are at."

Huttonsville Correctional Center (HCC) is a much more violent and dangerous facility than NCF and I am now in fear for my life. I am of the belief that at this time Morgan and/or Taylor are housed at HCC. I have since filed a grievance appealing the May 4, 2018 Special Management which was improperly conducted by Ryan Adams. I need to also point out to the court that "DMI" is the violent prison gang known as "Dead Men Incorporated."

ECF No. 1-14 at 1 – 2. Also attached to Plaintiff's complaint is a copy of a May 5, 2018 grievance in which Plaintiff stated he had requested keep-aways against inmates Joshua Morgan, Joshua Taylor, and Larry Cantrell, because he was planning to testify in federal court how they attacked and extorted David Buzzard. ECF No. 1-12 at 1 – 2. He further alleged that on May 4, 2018, Ryan Adams ("Adams") was "deliberately indifferent to a known risk of harm" when he refused to adhere to WVDOC Policy Directive 326.03 and conducted Plaintiff's Special Management hearing by himself without a Special Management Committee. Id. at 2. Adams denied Plaintiff's request for Special Management and refused to issue the keep-aways. Id. Plaintiff also alleges that

---

[13] Plaintiff has not named any defendant in this action by the name of Ryan Adams.

24

Adams told him he was throwing away Plaintiff's Special Management request, and that Adams promised to sent him to HCC where the DMI were, if he testified against them. Id.  Plaintiff avers that because the affidavit is already filed in the Court, when Morgan finds out, Plaintiff's life will be in danger and he will "most definitely be attacked." Id. Plaintiff asserts that he told Adams he could verify that Morgan made David Buzzard send the money to Plaintiff's mother, and made Plaintiff's mother send the money to "Joshua Morgan's people." Id. On May 7, 2018, Plaintiff's Unit Manager responded, stating "[y]our request [for Special Management] was not thrown away, the Director of Classification will conduct a hearing this week." Id. at 1. The grievance was appealed to the Warden and received on May 14, 2018. Id.  On May 15, 2018, the Warden noted "I will forward this grievance to the Director of Classification to determine status. Thank you." Id. On May 25, 2018, the Central Office received Plaintiff's appeal and denied the grievance. Id.

Plaintiff also attached a copy of a May 11, 2018 grievance to his complaint. ECF No. 1-13. In it, he alleges that

1) On or about May 5, 2018, Ryan Adams conducted a second improper special management hearing and denied my request for special management.

2) Present during this improper special management hearing was Ryan Adams, Dale Griffith, Robert Morris. None of these individuals work for mental health, and the WVDOC policy directives related to special management committees requires that at least one person from mental health must participate as a committee member.

Id. at 2. Attached to this grievance is a copy of a May 18, 2018 Memorandum from NCF, issued by "Brandy Miller, AWP," regarding Grievance # 18-NCC-C2-482, and stating:

Upon review, your Special Management Review was held in accordance to Policy Directive #326.03 Special Management. Policy Directives  326.03 and #401.01 Corre3ctional Classification Guidelines are used to define a facility's Special Management Committee. The committee consists of the facility's Director of Classification or Unit Manager, Case Supervisor, and members of the Counseling, Education, and/or Correctional Officer staff. The requirement for mental health staff to be a committee member for a Special Management Review does not exist.

Id. at 3.

In response, Defendants assert that Plaintiff's request for SMU fails to state a claim upon which relief can be granted, because all of Plaintiff's SMU claims aver that the it was a singular "respondent" who violated his/her duty toward him, and nowhere, does Plaintiff identify who that "respondent" is. ECF No. 49 at 11. Plaintiff fails to identify which Defendant he is referencing, which is fatal to his claims. Id. Defendants suggest that even if "the respondent" was the Northern Regional Jail, the NRJ is immune from § 1983 claims, which must be brought against persons, not the state or its agencies. Id. at 11 – 12. Moreover, they note that the "special relationship" Plaintiff asserts he has with the state does not grant him an "absolute right to special management whenever he is personally scared about something." Id. at 12. While the Eighth Amendment does impose a duty on prison officials to protect inmates from violence at the hands of other inmates, an official cannot be found liable unless the official knew of and disregarded an excessive risk; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and must also draw the inference. Id. The Eighth Amendment is not violated by negligent failures to protect inmates from violence. Id.

Defendants also assert that the prison had a SMU hearing for Plaintiff on May 8, 2018, but Plaintiff's request for SMU placement was denied; Plaintiff's grievance challenging the committee's failure to include a mental health staff member was also denied, because the same was not a requirement for a SMU committee. Id.; see also ECF No. 1-13 at 3. Defendants note that the Special Management Committee's judgment appears to have been sound, given that Plaintiff nowhere claims he was ever assaulted by any other inmate after the hearing. ECF No. 49 at 13. Moreover, Plaintiff was subsequently transferred to Mt. Olive Correctional Center ("MOCC") without incident. Id. Defendants contend that because Plaintiff received a procedurally

normal hearing, lost, and was never harmed after the meeting, he has suffered no damages entitling him to a remedy; moreover, because he has been transferred from NCF, any such request would be moot. Id. Finally, they contend that they are entitled to qualified immunity. Id. at 14.

Here, Plaintiff's claims about his denial of SMU placement fail to state a claim upon which relief can be granted.  Plaintiff's complaint fails to identify who the "respondent" he directs liability toward regarding his SMU request.  The grievances [ECF Nos. 1-12 and 1-13, and the Second Affidavit of Joshua Stevens, that Plaintiff references in connection with these claims only identify a "Ryan Adams" as being responsible for his having received an "improper" Special Management meeting: for denying his request for keep-aways [ECF Nos. 1-12 at 2, 1-14 at 2]; for allegedly throwing away his request for SMU [ECF No. 1-14 at 2];  for failing to include a mental health staff person on his Special Management Committee [ECF No. 1-13 at 2]; for conducting his Special Management hearing alone without a committee [ECF Nos. 1-12 at 2, 1-14 at 2]; and for threatening to send him to HCC where the violent prison gang DMI was, if he testified. ECF Nos. 1-12 at 2, 1-14 at 2.  Plaintiff has not named any defendant by the name of Ryan Adams in this action.  Because Plaintiff has failed to identify a named defendant personally responsible for these alleged violations,[14] his claims regarding SMU placement must be dismissed.

**E. Deliberate Indifference to Serious Medical Needs**

To state a claim under the Eighth Amendment for ineffective medical assistance, the plaintiff must show that the defendant acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To succeed on an Eighth Amendment cruel and unusual punishment claim, a prisoner must prove: (1) that objectively the deprivation of a basic human need was "sufficiently serious," and (2) that subjectively the prison official acted

---

[14] See Zatler v. Wainwright, 802 F.2d at 401.

with a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 298 (1991). Therefore, "the Eighth Amendment does not apply to every deprivation, or even every unnecessary deprivation suffered by a prisoner, but *only* that narrow class of deprivations involving 'serious' injury inflicted by prison officials acting with a culpable state of mind." Hudson v. McMillan, 503 U.S. 1, 20 (1970) (emphasis original).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or that is so obvious that even a lay person would recognize the need for a doctor's attention. Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990), *cert. denied*, 500 U.S. 956 (1991). A medical condition is also serious if a delay in treatment causes a life-long handicap or permanent loss. Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).[15]

---

[15] The following are examples of what does or does not constitute a serious injury. Testicular cancer is a serious medical need. Neihaus v. GEO Group, Inc., No. 3:13-cv-992, 2015 U.S. Dist. LEXIS 39481, *11, 14, Anderson, L.R. (S.D. Miss. Mar. 27, 2015). A torn rotator cuff is a serious injury. Fishback v. Depuy Orthopaedics, 2013 U.S. Dist. LEXIS 35562, * 28, 2013 WL 1010386 (D. Md. 2013); see also Oliver v. Pa Dep't of Corr., 2014 U.S. Dist. LEXIS 2368, *17-18, 2014 WL 80725 (E.D. Pa. 2014); Kostyo v. Harvey, No. 09-2509, 2010 U.S. Dist. LEXIS 93384, 2010 WL 3522449, at *8 (N.D. Ohio Sept. 8, 2010) ("Severe shoulder pain, including a possible rotator cuff tear, may qualify as a serious medical need."). A foot condition involving a fracture fragment, bone cyst and degenerative arthritis is not sufficiently serious. Veloz v. New York, 35 F.Supp.2d 305, 312 (S.D.N.Y. 1999). Conversely, a broken jaw is a serious medical condition. Brice v. Virginia Beach Correctional  Center, 58 F. 3d 101 (4th Cir. 1995); a detached retina is a serious medical condition. Browning v. Snead, 886 F. Supp. 547 (S.D. W. Va. 1995). Arthritis is a serious medical condition because the condition causes chronic pain and affects the prisoner's daily activities. Finley v. Trent, 955 F. Supp. 642 (N.D. W.Va. 1997). A pituitary tumor is a serious medical condition. Johnson v. Quinones, 145 F.3d 164 (4th Cir. 1998). A plate attached to the ankle, causing excruciating pain and difficulty walking and requiring surgery to correct it is a serious medical condition. Clinkscales v. Pamlico Correctional Facility Med. Dep't., 2000 U.S. App. LEXIS 29565 (4th Cir. 2000). A tooth cavity can be a serious medical condition, not because cavities are always painful or otherwise dangerous, but because a cavity that is not treated will probably become so. Harrison v. Barkley, 219 F.3d 132, 137 (2nd Cir. 2000). A prisoner's unresolved dental condition, which caused him great pain, difficulty in eating, and deterioration of the health of his other teeth, was held to be sufficiently serious to meet the Estelle standard. Chance v. Armstrong, 143 F.3d 698, 702 - 703 (2nd Cir. 1998). A degenerative hip a serious condition. Hathaway v. Coughlin, 37 F.3d 63, 67 (2d Cir. 1994). Under the proper circumstances, a ventral hernia might be recognized as serious. Webb v. Hamidullah, 281 Fed. Appx. 159 (4th Cir. 2008). A twenty-two hour delay in providing treatment for inmate's broken arm was a serious medical need. Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978). A ten-month delay in providing prescribed medical shoes to treat severe and degenerative foot pain causing difficulty walking is a serious medical need. Giambalvo v. Sommer, 2012 WL 4471532 at *5 (S.D.N.Y. Sep. 19, 2012). Numerous courts have found objectively serious injury in cases involving injury to the hand, including broken bones. See, *e.g.,* Lepper v. Nguyen, 368 F. App'x. 35, 39 (11th Cir. 2010); Andrews v. Hanks, 50 Fed. Appx. 766, 769 (7th Cir. 2002); Bryan v. Endell, 141 F.3d 1290, 1291 (8th Cir. 1998); Beaman v. Unger, 838 F.Supp.2d 108, 110 (W.D. N.Y. 2011); Thompson v. Shutt, 2010 WL 4366107 at *4 (E.D. Cal. Oct. 27, 2010); Mantigal v. Cate,

The subjective component of a cruel and unusual punishment claim is satisfied by showing that the prison official acted with deliberate indifference.  Wilson, 501 U.S. at 303.  A finding of deliberate indifference requires more than a showing of negligence. Farmer v. Brennan, 511 U.S. 825, 835 (1994). A prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. A prison official is not liable if he "knew the underlying facts but believed (albeit unsoundly) that the risk to which the fact gave rise was insubstantial or nonexistent." Id. at 844.

"To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment, [or lack thereof], must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). Multiple courts have held that inmates are not entitled to unqualified access to healthcare, and a mere disagreement in regard to the diagnosis and recommended course of treatment is insufficient to support a deliberate indifference claim. Bowring v. Godwin, 551 F.2d 44, 47-48 (4th Cir. 1977); Wright v. Collins, 766 F.2d 841, 841-849 (4th Cir. 1985); Daye v. Proctor, 2015WL 1021560 25833, *3 (N.D. W.Va. Mar. 4, 2015) (Keeley, J.) citing Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) ("An inmate's disagreement with a medical officer's diagnosis or course of treatment will not support a valid Eighth Amendment claim."). Further, "inmates are not entitled to the best medical care or the particular medical care of the inmate's choosing." Witherspoon v. United States, 2010 U.S. Dist. LEXIS 107159, *10

2010 WL 3365735 at *6 (C.D. Cal. May 24, 2010) report and recommendation adopted, 2010 WL 3365383 (C.D. Cal. Aug. 24, 2010); Johnson v. Adams, 2010 WL 1407787 at *4 (E.D. Ark. Mar. 8, 2010) report and recommendation adopted, 2010 WL 1407790 (E.D. Ark. Mar. 31, 2010); Bragg v. Tyler, 2007 WL 2915098 at *5 (D.N.J. Oct. 4, 2007); Vining v. Department of Correction, 2013 U.S. Dist. LEXIS 136195 at *13 (S.D.N.Y. 2013)(chronic pain arising from serious hand injuries satisfies the objective prong of Eighth Amendment deliberate indifference analysis). A three-day delay in providing medical treatment for an inmate's broken hand was a serious medical need. Cokely v. Townley, 1991 U.S. App. LEXIS 1931 (4th Cir. 1991).

(S.D. W.Va. Sept. 27, 2010) (internal citation omitted). Finally, a mere delay in medical treatment does not give rise to a constitutional violation, but rather, there must be some substantial harm to the inmate. Williams v. Miles, 2009 U.S. Dist. LEXIS 57833, at *2 (S.D. W.Va. July 7, 2009).

A constitutional violation is established when "government officials show deliberate indifference to those medical needs which have been diagnosed as mandating treatment, conditions which obviously require medical attention, conditions which significantly affect an individual's daily life activities, or conditions which cause pain, discomfort or a threat to good health." See Morales Feliciano v. Calderon Serra, 300 F.Supp.2d 321, 341 (D.P.R. 2004) (citing Brock v. Wright, 315 F.3d 158, 162 (2nd Cir. 2003)).

Here, Plaintiff contends that he suffered unspecified injuries to his head, neck, back, left hand and left index finger, and that Defendant Scott was deliberately indifferent by failing to provide immediate, timely post-injury evaluation. Because neither party has produced medical records, the undersigned must glean the factual history from a careful review of the contemporaneously-filed grievances and responses attached to Plaintiff's complaint.

On April 18, 2018, Plaintiff filed a grievance stating:

> I fell on the steps in front of a Medical Staff member and 3 NCF staff members on 4/16/18 around 6 pm at pill call on C-2. They asked I was alright and I told them that I wanted to go to medical because my vision was blurry and my ears were ringing my head and back hurt tremendously. I was put back in the cell and told that they would call and check after the nurse was done pill call. I waited for over 30 minutes w/ these symtoms [sic] for them to bring a wheelchair and take me to medical.

ECF No. 1-8 at 1. Under "relief," Plaintiff wrote "I want the nurse held responsible for not being a professional and taking me to medical to be evaluated immediately. I want injuries like mine to be taken seriously and handled professionally." Id. Plaintiff's Unit Manager accepted the grievance on April 19, 2018. Id. On April 27, 2018, Plaintiff appealed to the Warden. Id. On May 2, 2018,

the Warden responded: "[p]lease refer to Level One Response. It is affirmed." Id. The Central

Office affirmed, denying the grievance. Id. Attached to the grievance is an April 18, 2018 note

from Tammy Simms, RN MSN, WV Regional Director of Nursing, stating in pertinent part that:

> [t]his is in response to your grievance dated 4/18/18.  After reviewing your
> grievance, I found that you were placed in the medical unit for observation
> overnight. The Nurse Practitioner was notified that you were placed in medical and
> orders received were to watch you overnight. You were checked on several times
> throughout the night with only complaints of swelling and bruising to the left index
> finger. At 0548 you stated that your symptoms had subsided and you wanted to
> return to your cell. Because you showed no further symptoms you were released
> back to your cell the next afternoon. This was proper procedure concerning your
> issues.

Id. at 2.

On April 18, 2018, Plaintiff filed another grievance, stating in pertinent part that:

> I was put in Medical overnight on 4-16-18 for injuries that I sustained to my head
> and back when falling on the steps. I was supposed to be evaluated by Pam the
> nurse practitioner before being released back to my cell.  This was never done. I
> was released back to my cell w/o a[n] evaluation. I still am having symtoms [sic]
> of this head injury and back injury . . .

ECF No. 1-7 at 1.  Under "relief," Plaintiff wrote "[f]irst and foremost, Pam needs to be held

responsible for not doing her job as a professional. Injuries such as mine need to be taken more

seriously. Just because I'm an inmate doesn't mean that I don't deserve proper and professional

medical treatment." Id. Plaintiff's Unit Manager accepted the grievance on April 19, 2018. Id. On

April 27, 2018, Plaintiff appealed to the Warden. Id. On May 2, 2018, the Warden responded:

"[p]lease refer to Level One Response. It is affirmed." Id. Attached to the grievance is an April 18,

2018 note from Tammy Simms, RN MSN, WV Regional Director of Nursing to Plaintiff, stating

in pertinent part:

> [t]his is in response to your grievance dated 4/18/18.  After reviewing your
> grievance, I found that you were placed in the medical unit for observation
> overnight. The Nurse Practitioner was notified that you were placed in medical and
> orders received were to watch you overnight. You were checked on several times

throughout the night with only complaints of swelling and bruising to the left index finger. At 0548 you stated that your symptoms had subsided and you wanted to return to your cell. Because you showed no further symptoms you were released back to your cell the next afternoon. This was proper procedure concerning your issues.

Id. at 2.

On April 21, 2018, Plaintiff filed another grievance, stating "I put in a sick call on my injuries and symtoms [sic] thereof [sic] on 4/18/18 and have not been checked or seen about them at all. By protocol they are supposed to see you within 24 hrs." ECF No. 1-6 at 1.  Under relief, Plaintiff noted "I want medical personel [sic] to do their jobs and take issues w/ peoples [sic] health and wellbeing serious." Id. The grievance was accepted by his Unit Manager on April 23, 2018. Id. Plaintiff appealed the grievance to the Warden on April 27, 2018. On May 2, 2018, the Warden responded, "[p]lease refer to Level One response. It is affirmed." Id. Attached to the response is an April 21, 2018 note to Plaintiff from Tammy Simms, WV-Regional Director of Nursing, stating " . . . This is in response to your grievance dated 4/21/2018.  After reviewing your chart, I found that you were followed up with by the physician on 4/23/18. Therefore, you have been followed up with after your incident." Id. at 2.

On April 21, 2018, Plaintiff filed another grievance, stating "I need photos of my injuries taken by C/O Folmer on 4/17/18 and video of the incident where I fell on 4/16/18 on the steps in C-2 pod all the way up until they took me to medical, preserved as evidence for future litigation." ECF No. 1-2 at 1. Under "relief sought," Plaintiff wrote "Released from segregation immediately and compensated for my injuries." Id. On April 23, 2018, his Unit Manager responded: "Your attorney needs to request these from our legal department in Central Office." Id. On April 27, 2018, Plaintiff appealed to the Warden. Id. The Warden's May 2, 2018 response was "Level One decision is affirmed. Any type of legal request must go through legal channels." Id.

On April 22, 2018, Plaintiff filed a grievance stating "I need the video from medical on 4/16/18 till 4/17/18, when I was in medical cell 3 and left at around 1:15 pm, preserved for future litigation. Thank you." ECF No. 1-4 at 1. Under "relief sought," Plaintiff noted "I want medical personel [sic] to be held responsible and injuries like mine to be taken seriously." Id. On April 23, 2018, his Unit Manager responded: "Please state what the issue was with medical and list the approximate time." Id. On April 27, 2018, Plaintiff appealed to the Warden. Id. The Warden's May 2, 2018 response was "as requested by the AWS, please state what happened & times[.] This allegation will be reviewed." Id.

On April 27, 2018, Plaintiff filed a grievance stating

> Wexford Medical's Nurse Michelle Scott was deliberately indifferent to me and my head, back, neck, finger injuries by throwing me back into my cell on C-2 after witnessing me fall on the steps. She said she had to finish pill call before she could check me out after I told her that my ears were ringing and my head hurt bad and that my sight was blurry and I was nauseated. It took her over 30 minutes to have them come get me in a wheelchair. I lost concussness [sic] twice in the cell and puked.

ECF No. 1-9 at 1.  Under "relief," Plaintiff wrote "I want the nurse repremanded [sic] for not stoping [sic] everything she was doing for my emergency situation and I want injuries like mine to be taken seriously." Id. Plaintiff's Unit Manager accepted the grievance on April l30, 2018. Id. Plaintiff appealed to the Warden on May 10, 2018. Id. on May 14, 2018, the Warden responded: "[a]s requested, please indicate the specific incident, date/time so that it may be reviewed. Thank you." Id.  The Central Office affirmed, denying the grievance. Id. Attached to the grievance is a note from James F. Gray, H.S.A., stating in pertinent part that:

> "[t]his is in response to your grievance dated 4/27/18.  After reviewing your grievance, I found that there is no documentation about what you are describing. I will need specific date and time of this. In general though, I want the staff to act professional at all times and will remind them of the procedures for emergencies and injuries.

Id. at 2.

On April 27, 2018, Plaintiff filed another grievance stating

I have submitted numerous sick calls concerning my head injury and back injury to no avail. Yes they had a physician see me and order x-ray for back and that is it. My symtoms [sic] are still effecting [sic] me tremendously every day and my sick calls are not being answered w/in 24 hrs. This is not a joke. Just because I'm an inmate doesn't mean that I have to suffer or be in pain all day and night."

ECF No. 1-10 at 1. On April 30, 2018, Plaintiff's Unit Manager accepted the grievance. Id. On

May 10, 2018, Plaintiff appealed. Id. On May 15, 2018, the Warden responded "Level One

Response is affirmed. Thank you." Id. The grievance was denied in the Central Office. Id. Attached

to the grievance is a note from James F. Gray, H.S.A., stating

[t]his is in response to your grievance dated 4/27/2018. After reviewing your grievance, I found that you are on the list to see Dr. Patel about this issue. I want the staff to act professional at all times and will remind them of the procedures for emergencies and injuries.

Id. at 2.

On April 27, 2018, Plaintiff filed a third grievance, stating that

Wexford Medicals [sic] nurse practitioner Pam was deliberately indifferent to me and my head, neck, back, finger injuries releasing me from Med Cell 3 on 4/17/18 w/o any type of evaluation or even ask n [sic] me how I felt. Since then my back is still causen [sic] me pain & numbness and I have major headaches every day. They told me before I could leave medical that I had to see Pam for an evaluation on my injuries."

ECF No. 1-11 at 1.  On April 30, 2018, Plaintiff's Unit Manager accepted the grievance, noting

"see attached." Id. On May 10, 2018, Plaintiff appealed. Id. On May 15, 2018, the Warden

responded: "[p]lease refer to answer received at Level One by HSA (Wexford) James Gray → that

answer is affirmed. Thank you." Id. The Central Office affirmed the denial of the grievance. Id.

Attached to the grievance is a May 4, 2018 note to Plaintiff from James F. Gray, H.S.A., stating in

pertinent part that:

This is in response to your grievance dated 4/27/2018. After reviewing your grievance, I found that there is documentation stating that you were seen by NP Pam Moore about this issue before being released to go back to your pod . . .

Author: Moore, FRNP, Pamela
Date: 4-20-2018 1253

Note: Late entry: seen on 4/18/18 index finger of left hand bruised between 1st and 2nd knuckle, mild swelling. Full rom[16] to all fingers bilateral hands. Ambulates with steady gait. IM requesting to go back to pod. Released from medical.

Highlight note? No
Related problems: (none)

Id. at 2.

On May 17, 2018, Plaintiff filed another grievance, stating

I have been putting sick call after sick call in repeatedly for my chronic back issues that they say I have that were reinjured when I fell on 4/16/18. I also injured my head and finger and neck. These injuries are not going away or getting any better. My headaches are still there. I cannot use my finger and my lower back is killing me w/ pain and my legs are going numb. Please do something.

Id. at 3. Under relief, Plaintiff wrote "I want my injuries fixed or at least made to where I am not in so much pain and suffering and can sleep all night and be active w/o chronic pain and numbness." Id. Plaintiff's Unit Manager accepted the grievance on May 18, 2018, noting "see attached." Id. Plaintiff appealed to the Warden on May 24, 2018. Id. On May 29, 2018, the Warden responded: "[c]linical decisions are the sole province of the responsible health care practitioner and are not countermanded by non clinicians." Id. The Central Office affirmed the denial of the grievance. Id. Attached to the grievance is a May 23, 2018 note from James F. Gray, H.S.A., stating that "[t]his is in response to your grievance dated 5/17/2018. After reviewing your grievance, I found that you have been seen for your issues by the Nurse Practitioner on 5/23/2018." Id. at 4.

On May 24, 2018, Plaintiff filed another grievance, stating

---

[16] "ROM" is a medical abbreviation for "range of motion."

Opon [sic] further review of grievance #18.NA.C-2.5C9 I am sorry to report that on Wednesday the 23rd of May I wasn't seen by anyone in Medical. A quick review of the camera will show you that it doesn't matter what is written down in your logs, cameras don't lie[,] Mr. Gray. I can't believe that they are lieing [sic] to you and saying that they seen me[.]

Id. at 5. On May 31, 2018, Plaintiff's Unit Manager accepted the grievance, noting "see attached."

Id. Plaintiff appealed to the Warden on June 8, 2018. Id. On June 12, 2018, the Warden responded: "[c]linical decisions are the sole province of the responsible health care practitioner & are not countermanded by non-clinicians." Id. The grievance was denied by the Central Office. Id. Attached to the grievance is a June 6, 2018 note to Plaintiff from James F. Gray, H.S.A., stating in pertinent part that

[t]his is in response to your grievance dated 5/24/2018. After reviewing your grievance, I found that you were sent on 6/6/2018 for an MRI. The following is an excerpt from your chart concerning your finger:

Date: 5/24/2018 11:14 Author: Moore, FRNP, Pamela

IM to medical for xray of hand, due to ongoing complaints of ring finger pain[17] s/p fall over a week ago. Ambulating with steady gait, no limp, guarding, facial grimacing or appearance of pain. Escorted by 2 officers. IM has continued complaints of back pain with spasms, and numbness to both legs. Collegial has been submitted.[18] legs. Collegial has been submitted.  ←

Id. at 6.

Defendant Scott is identified in Plaintiff's complaint as an "LPN." ECF No. 1 at 4.  Scott's memorandum in support of her dispositive motion does not dispute this. Plaintiff's complaint alleges that Scott witnessed his April 16, 2018 fall but then refused to immediately evaluate him

---

[17] Plaintiff's fall-related complaint of finger pain was an injury to his left index finger, not his ring finger.

[18] Wexford's Collegial Review Committee decides whether a consultation with an outside specialist is warranted for a particular inmate. When a physician makes a non-emergent referral for an inmate, the referral is evaluates within a week from the time it is made, during a weekly scheduled call, and when a referral is urgent, a provider can request an earlier appointment for a collegial review, subject to availability. See Baker v. Wexford Health Sources, Inc., 118 F.Supp.3rd 985, 999 - 1000 (N.D. Ill. Jul. 28, 2015).

because she had to complete pill call for other inmates first; instead, after speaking to him, Scott had him put back in his cell to wait "for over 30 minutes" for her to return and examine him. ECF No. 1 at 11. During this time, he alleges he "lost consciousness and woke up on the floor" and also vomited. Id.

Defendant Scott contends that Plaintiff's complaint fails to state a claim upon which relief can be granted against her, because it fails to even clearly allege any act on her part; instead, it attributes some of the acts to an "unnamed nurse." ECF No. 56 at 6. Nonetheless, Scott contends that even assuming that all the acts attributed to the "unnamed nurse" were attributed to her, it would still not rise to the level of deliberate indifference. Id. Scott contends that Plaintiff's total claim against her amounts to a claim of delay in treatment; she cites to Formica v. Aylor, 739 Fed. App'x. 745, 755 (4th Cir. June 25, 2018), for the proposition that when a claim is predicated on a delay in medical care, no Eighth Amendment violation occurs unless the delay results in some substantial harm to the patient, such as a marked exacerbation of the medical condition or frequent complaints of severe pain. Scott contends that the 30-minute delay in examining Plaintiff was *de minimis*, and that moreover, Plaintiff fails to allege any marked exacerbation in his condition or frequent complaints of pain as a result of the brief delay. ECF No. 56 at 7.

The undersigned notes that as for Plaintiff's claim immediately after briefly examining him after the fall, Scott had him sent back to his cell to wait "for over 30 minutes" for her to finish pill call before examining him, and while he waited, he lost consciousness, woke up on the floor, and also vomited, but that the grievance Plaintiff filed two days after the fall, when presumably his memory would have been freshest, makes *no mention* of having lost consciousness, fallen again, and/or having vomited when he was left alone to wait. Plaintiff's only complaint in that grievance was that he was left alone to wait "over 30 minutes" while suffering blurred vision, ringing in his

ears, and back pain. ECF No. 1-8 at 1. However, nine days later, in an April 27, 2018 grievance, Plaintiff complained that Defendant Scott was deliberately indifferent to him "by *throwing me back into my cell* [to wait] . . . after witnessing me fall[;]" making him wait "over 30 minutes" while he was experiencing blurred vision and nausea, and that while he waited, he *lost consciousness twice* and vomited. ECF No. 1-9 at 1 (emphasis added). Finally, Plaintiff's October 28, 2019 response in opposition contends that he was left alone in his cell after the fall for "*nearly 45 minutes*," where he passed out, fell again, and *vomited twice* while waiting for help. ECF No. 37-1 at 1. It appears then, that Plaintiff has continuously embellished the severity of his symptoms.

Nonetheless, the record is devoid of any specifics provided by either party as to what Plaintiff's April 16, 2018 injuries from the fall actually were, beyond the general description of "injuries" to Plaintiff's head, neck, spine, finger, lower back and leg. ECF No. 1 at 9. Therefore, it is impossible to determine whether Plaintiff did in fact suffer a "serious" medical need, i.e., one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, or an injury diagnosed by a physician as mandating treatment. Plaintiff's complaint does not allege any fracture, laceration, strain or sprain to any part of his body, nor does it allege he suffered a concussion; admittedly, while his response in opposition contends that he was suffering "symptoms of" concussion [ECF No. 37-1 at 1], it falls short of alleging he was ever actually *diagnosed with* concussion.

However, assuming *arguendo* that Plaintiff did in fact suffer a concussion, a serious medical need that would satisfy the objective element, Plaintiff's complaint, his grievances and the responses thereto, and the affidavits of the two prisoners who state they witnessed the fall establish that Plaintiff was immediately, if briefly, seen by Defendant Scott; was taken to medical by wheelchair within 30 minutes to receive a full evaluation, and as a result of that evaluation,

Plaintiff was kept overnight in medical for observation, "just in case," because of his initial complaints of blurred vision, ringing in his ears, and back pain. While Plaintiff disputes Defendants' contention that this was adequate and appropriate care, the record indicates that he was repeatedly evaluated several times throughout the night (by Plaintiff's description, by an "unknown nurse"); and that by around 5:45 a.m., he complained only of swelling and bruising to the left index finger and was already requesting to be released back to his cell because his symptoms had subsided. ECF No. 1-8 at 2. Notably, Plaintiff's subsequent grievances never disputed that this was untrue. Moreover, per Plaintiff's own admission, he was *not* released to his cell the following morning [ECF No. 1-4 at 1], implying that the health care staff kept him longer than he preferred, presumably for continued observation, hardly evidence of deliberate indifference. Plaintiff's contemporaneously-filed grievances and responses reveals that Plaintiff was checked briefly by LPN Scott immediately after the fall; fully evaluated by Scott in medical within one half hour; despite the evaluation's conclusion that he was "fine," he was still kept overnight in medical by orders from Defendant Moore for observation, "just in case [ECF No. 37-1 at 1]," (implying that there was no apparent serious injury but that Plaintiff was kept overnight based on his own subjective, reported symptoms); and not released until 1:15 p.m. the next day, despite his having wanted to leave seven and a half hours earlier because his symptoms had subsided.

As noted *supra*, mere delay in providing medical treatment does not give rise to a constitutional violation without showing some substantial harm to the inmate. Williams v. Miles, 2009 U.S. Dist. LEXIS 57833 at *2. Here, Plaintiff has shown neither. Even if his unspecified injuries had constituted the objective element of serious medical needs, Plaintiff cannot satisfy the subjective element, and therefore, he fails to establish an Eighth Amendment violation. Mere

disagreement with medical staff's decisions regarding the timing, treatment, diagnostic testing, and/or necessity for referral to outside physician(s) of an inmate's choice does not support a claim of cruel and unusual punishment. See Russell v. Sheffer, 528 F.2d at 319.

Further, a complaint must include "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . " Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level." Id. Here, Plaintiff's complaint has not asserted any factual allegation against Scott that meet the "heightened pleading standard" required in actions against government officials, or that would give rise to relief above a speculative level, to establish a constitutional violation, let alone any injury or harm.

Accordingly, based upon the record before the undersigned, the plaintiff has failed to establish that Scott was deliberately indifferent to any of his serious medical needs. Because the plaintiff has not shown that Scott violated his constitutional rights, Scott is entitled to qualified immunity. See Wilson v. Layne, 526 U.S. at 609.

### V. Recommendation

In consideration of the foregoing, it is the undersigned's recommendation that the WVDOC Defendants Motion to Dismiss [ECF No. 48] and that Defendant Scott's Motion to Dismiss [ECF No. 55] be **GRANTED,** and that these Defendants be **DISMISSED with prejudice from this action for the failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. 1915(e)(2)(ii)**.

The parties are notified that this Report and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rules 6(d) and 72(b), Federal

Rules of Civil Procedure, and Rules 1(b) and 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2254 of Title 28, United States Code, **any party shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Report and Recommendation within which to file with the Clerk of this Court**, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12. Extension of this time period may be granted by the presiding District Judge for good cause shown.

**Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984). A copy of such objections shall be served on Judge Kleeh.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

Finally, because this Report and Recommendation completes the referral from the District Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATED: January 5, 2021

/s/ *Michael John Aloi*

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE